UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | * | CASE NO. 15-12229 |
| | * | |
| AMERICAN NATURAL | * | SECTION "A" |
| ENERGY CORPORATION | * | |
| | * | CHAPTER 11 |
| DEBTOR | * | |
| | * | |
| | * | |

******************************************

## AFFIDAVIT OF STEVEN P. ENSZ
## IN SUPPORT OF FIRST DAY MOTIONS

**Steven P. Ensz**, hereby states:

1.  I am the Chief Financial Officer ("CFO") of the above-captioned Debtor in this bankruptcy case.

2.  On August 31, 2015, (the "Petition Date"), Hillair Capital Investments, L.P., C&M Contractors, Inc., REAMCO, Inc., and Bayou Fuel Marine & Hardware Supplies, Inc. (collectively, "Creditors") commenced an involuntary bankruptcy case under Chapter 11 of Title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.,* as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Louisiana. On October 2, 2015, the Debtor filed its Consent to Entry of an Order for Relief [Docket No. ] and the Order for Relief was entered on October 2, 2015 [Docket No. ].

3.  In my capacity as CFO of the Debtor, I am familiar with the Debtor's day-to-day operations, business and financial affairs, and books and records. I submit this affidavit (a) in support of the relief that the Debtor has requested of the Court by motions and applications filed on October 2, 2015 (collectively, the "First Day Motions"), and (b) to assist the Court and other

interested parties in understanding the circumstances that compelled the Creditors to commence this involuntary Chapter 11 case and the Debtor to consent to entry of an order for relief.

4. Except as otherwise indicated, all facts set forth in this affidavit are based on my personal knowledge, upon information supplied to me by other individuals employed or engaged by the Debtor, upon my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtor's operations, financial condition, and history. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this affidavit on behalf of the Debtor.

**The Debtor's History and Operations**

American Natural Energy Corporation is engaged in the acquisition, development, exploitation and production of oil and natural gas.

American Natural Energy Corporation is an Oklahoma corporation, and our wholly-owned subsidiary, Gothic Resources Inc., is a corporation organized under the Canada Business Corporation Act. References to Gothic refer exclusively to our wholly-owned subsidiary, Gothic Resources Inc. and references to ANEC refer exclusively to American Natural Energy Corporation, organized under the laws of Oklahoma. Through December 2001, our activities were conducted through Gothic, and Gothic may be deemed a predecessor of ANEC.

ANEC holds mineral interests in approximately 1,320 acres of land in St. Charles Parish, Louisiana. This acreage is the Bayou Couba leases in which we hold a 97.25% working interest in the leasehold and 97.25% working interest in all but 7 producing wells. The ownership results from our acquisition on December 31, 2001, of the assets and outstanding stock of Couba Operating Company ("Couba") and the consolidation of other working interests in the field

during 2009. We continue to need and seek material amounts of additional capital to further our oil and natural gas development and exploitation activities.

Since 2002 through December 31, 2013, we returned to production 5 (4.86 net) well bores drilled by the prior owners on the Couba properties we acquired. Our drilling activities commenced in February 2003 and as of December 31, 2013, we had drilled and completed 9 (6.11 net) wells. For the year ended December 31, 2013, our combined production from all our producing wells (14 gross, 10.97 net) averaged approximately 126(84net) barrels of oil equivalent per day. Production from our existing wells is subject to fluctuation from time to time based upon the zones of the wells where we are obtaining production.

**The Couba Properties.**

Couba, organized in 1993, was primarily engaged in the production of oil from properties located in St. Charles Parish, Louisiana. Couba's principal acreage was the Bayou Couba Lease under which Couba owned a 72% working interest in 1,320 gross acres. Production from the wells commenced in 1941 and only oil and non-commercial quantities of natural gas were produced. Natural gas had never been produced in commercial quantities, and all gas production wells from the original development of the property were plugged.

The principal asset of Couba that ANEC acquired was the Bayou Couba Lease. The lessor is ExxonMobil and the lease is held by production of oil and gas on the property. The additional Couba assets we acquired include a gathering system covering approximately 25 miles located on the Bayou Couba Lease, used solely as a production collection system among the wells on the leased property leading to a product distribution point, and various production facilities, geological data, well logs and production information. The information includes 3-D seismic information completed in 1997. The seismic information relates to an area of

approximately 23.5 square miles that includes the Bayou Couba Lease, among other acreage. The gathering system ANEC acquired was initially not in operable condition. Subsequently, as part of approximately $1.1 million ANEC expended to restore existing wells to production, we refurbished and upgraded the system so as to be usable. At present, the system, which consists of flow lines, connections and related facilities, is used to transport production of oil and gas to points where it is trans-shipped and sold.

In July 2002, ANEC completed the restoration activities on the Bayou Couba Lease and brought the operation into compliance with applicable regulatory requirements. ANEC also completed reprocessing the 1997 3-D seismic information it acquired as part of the Couba transaction and we are continuing to review that data. It also were able to get five well bores on the Bayou Couba lease that had been drilled by the former owners into a producing condition.

ANEC's activities in 2002 also included refurbishing the gathering line connected to the wells. This gathering line delivers its current production of natural gas to the Transco pipeline for further delivery to an interstate pipeline.

In February 2003, ANEC commenced drilling on the Bayou Couba Lease and by December 31, 2003, it had drilled and completed 6 (2.19 net) wells on the property. One well drilled during 2003 was unsuccessful and was plugged.

During 2005, ANEC restored to production 1(.81 net) well that had been acquired as part of the original Bayou Couba acquisition. ANEC also drilled and completed 3 (.61 net) development wells.

During 2006, ANEC drilled and completed 2 (.05 net) development wells.

NO KML 889557 v4
2900009-000020

During 2009 ANEC acquired all of the working interest of Dune Energy as well as other small interest owners in the field. The acquisitions effectively added an additional 6.56 net wells to our ownership interest.

For the year ended December 31, 2010, combined production from all our producing wells on the property averaged approximately 162(92 net) barrels of oil equivalents per day.

For the year ended December 31, 2011, combined production from all of the producing wells on the property averaged approximately 84 (51 net) barrels of oil equivalents per day.

For the year ended December 31, 2012, ANEC drilled and completed 1 (1 net) development well. Combined production from all of the producing wells on the property averaged approximately 84 (52 net) barrels of oil equivalents per day.

For the year ended December 31, 2013, combined production from all producing wells on the property averaged approximately 126 (84 net) barrels of oil equivalents per day.

For the year ended December 31, 2014, combined production from all producing wells on the property averaged approximately 72 (47 net) barrels of oil equivalents per day. Production declined from prior years in part resulting from restrictions place on available cash flow by our secured lender. These restrictions limited ANEC's ability to adequately provide needed maintenance and supplies necessary to sustain previous production levels. As a result, in July 2014 ANEC entered into a financing agreement with Hillair Capital to replace the prior lender. In addition to the replacement of the previous debt, Hillair provided some incremental capital for use in the field. In November 2014, significant declines to commodity prices further reduced available cash from operations. By December 31, 2014 ANEC did not have sufficient cash to meet payments to Hillair required on January 1, 2015.

NO KML 889557 v4
2900009-000020

During 2015, cash flow continued to deteriorate with declining commodity prices. In February 2015, sales of oil were curtailed due to a leak discovered in the oil gathering line owned by a third party. Permits to repair the line were finally received during the summer but the line was determined to be beyond repair and it is in the process of being abandoned by its owner. Consequently, ANEC has been obtaining the necessary documentation, upgrades and approvals required to begin barging oil to market. ANEC has a firm proposal from Shell Oil for the barged oil. However, the sustained period of time without a market for oil has resulted in default of obligations. As a result an Involuntary Petition has been filed against the company.

## First Day Motions

5.      Shortly after the Creditors initiated an involuntary Chapter 11 case and simultaneously with its filing a consent to entry of an order for relief, the Debtor filed the First Day Motions, each of which is described briefly below. I have reviewed each of the First Day Motions (including the exhibits and other documents attached thereto or submitted therewith) and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtor to operate in Chapter 11 with a minimum of disruption and loss of revenue, and constitutes a critical element in achieving a successful reorganization of the Debtor.

6.      The First Day Motions consist of the pleadings described below.

***Application by the Debtor for Entry of an Order Authorizing the Employment and Retention of the Law Firm of Baker, Donelson, Bearman, Caldwell, & Berkowitz, PC as Counsel for the Debtor***

7.      The Debtor seeks to retain Baker, Donelson, Bearman, Caldwell, & Berkowitz, PC ("Baker Donelson") as its attorney because of Baker Donelson's extensive experience and knowledge in matters of this nature and business reorganizations under Chapter 11 of the

Bankruptcy Code. Additionally, the Debtor submits that Baker Donelson's expertise, experience, and knowledge will be efficient and cost effective for the Debtor's estates.

8. In preparing for this bankruptcy case, Baker Donelson has become familiar with the Debtor's business and financial affairs and many of the potential legal issues which may arise in the context of this Chapter 11 case. Accordingly, the Debtor believes that Baker Donelson is both well qualified and uniquely able to represent the Debtor as counsel in its Chapter 11 case in an efficient and timely manner.

9. The employment of Baker Donelson as the Debtor's bankruptcy counsel, pursuant to the terms of this Application is appropriate and necessary to enable the Debtor to execute faithfully its duty as a debtor and debtor in possession and to implement a successful restructuring and reorganization of its business operations and financial affairs.

Additionally, Baker Donelson should be retained to assist the Debtor as to oil and gas issues in Louisiana.

***Motion for Administrative Order under Sections 105(A) and 331 of the Bankruptcy Code Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals***

10. The Debtor filed applications to retain Baker Donelson and Edwards, as its professionals and anticipates retaining other professionals as the need arises. In addition, the Debtor expects that this Court will authorize the retention of certain professionals for committees appointed under relevant provisions of the Bankruptcy Code and, if appropriate, certain other parties in interest. The entry of the proposed administrative order would benefit the administration of the Debtor's estate with respect to reviewing and satisfying fee applications of all of these professionals.

11. By the above-titled motion, the Debtor requests that procedures for compensating and reimbursing court-approved professionals on a monthly basis be established, comparable to

the procedures established in other Chapter 11 cases in this district. Such an order will permit the Court and all other parties to more effectively monitor the professional fees incurred in this Chapter 11 case.

*Motion to Limit Notice*

12.     The Debtor's consolidated mailing matrix consists of hundreds of persons and entities that have an interest in this bankruptcy case. Ongoing mailouts to all persons and entities, which have an interest in this case, would be overly costly and unduly burdensome to the Debtor, its counsel, and its estate. The Debtor's Motion to Limit Notice appropriately balances the interests of parties in interest to notice in this Chapter 11 case with the reasonable and efficient administration of the Debtor's estates.

*Motion for Authority to Pay Employees' Pre-Petition Wages, Related Expenses, Benefits, and Taxes*

13.     The Debtor currently employs five people, all of whom are full-time, to oversee and operate the Properties on a day-to-day basis (the "Employees").

14.     To minimize the personal hardship the Employees will suffer if pre-petition employee-related obligations are not paid when due, and to maintain Employees' morale at this critical time, the Debtor, by this Motion, seeks authority to pay certain pre-petition claims for, among other items, wages (including but not limited to salaries, commissions, bonuses and other compensation), accrued vacation and PTO, sick or other paid leave, federal and state withholding taxes, payroll taxes, contributions to employee benefit plans (including but not limited to 401(k) plans), medical insurance, executive medical, dental insurance, vision insurance, life insurance, housing allowance and disability, and insurance premiums under the workers' compensation program, as well as Reimbursable Expenses.

*Motion for an Order Authorizing the Debtor to Pay Certain Pre-petition Taxes*

15. In connection with the normal operation of its business, the Debtor (a) incurs certain taxes, including, but not limited to real and personal property taxes (collectively "Taxes"); (b) is charged certain fees, licenses and other similar charges and assessments (collectively "Fees") on behalf of various taxing and licensing authorities for payment to such Authorities. The Taxes and Fees are paid either monthly, quarterly, or yearly to the various Authorities. On the Petition Date, the Debtor held Taxes incurred or collected pre-petition which had not yet been paid to the Authorities.

16. The Debtor respectfully submits that the Court should authorize the payment of the Taxes and Fees because: (a) certain of the Taxes do not constitute property of the Debtor's Chapter 11 estate; (b) substantially all of the Taxes and some of the Fees constitute priority claims that will be paid in full under a Chapter 11 plan; (c) failure to pay certain of the Taxes and Fees may impact the Debtor's ability to conduct business in certain jurisdictions; (d) failure to pay the Taxes and Fees may impact the permits & licenses owned by the Debtor; and (e) the Debtor's officers and directors may face personal liability if certain of the Taxes and Fees are not paid. Absent payment of these amounts, the Debtor may face serious disruptions and distractions as they seek to reorganize.

17. Accordingly, by this Motion, the Debtor seeks authority, in its discretion, to pay the Taxes and Fees to the relevant Authorities in the ordinary course of business.

***Motion for Interim and Final Orders: (a) Prohibiting Utilities From Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtor on Account of Pre-petition Invoices; (b) Determining that the Utilities are Adequately Assured of Future Payment; (c) Establishing Procedures for Determining Requests for Additional Assurance; and (d) Permitting Utility Companies to Opt Out of the Procedures Established Herein***

18. The Debtor currently uses phone and other similar services under approximately three separate accounts provided by two different Utility Companies

19. Uninterrupted utility service is essential to the Debtor's ongoing operations, and therefore, to the success of the Debtor's reorganization. The Debtor cannot operate its business in the absence of continuous utility service. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtor would be forced to cease its operations, resulting in a substantial disruption of its business and loss of revenue. The temporary or permanent discontinuation of utility services at the Debtor's business location could irreparably harm the Debtor's business and jeopardize the Debtor's reorganization efforts.

20. The Debtor requests entry of an interim order: (a) prohibiting those utility companies currently providing services, or that will provide services, to the Debtor from altering, refusing, or discontinuing services to, or discriminating against, the Debtor on account of pre-petition amounts due, pending entry of final order granting the relief sought herein; (b) determining that the Utility Companies are adequately assured of payment for future utility services, pending entry of the final order; (c) establishing certain procedures for determining requests for additional assurance; (d) permitting Utility Companies to opt out of the procedures established in the Motion; and (e) scheduling a final hearing on the Motion within thirty (30) days of the date hereof. The Debtor also seeks the entry of a final order granting the relief requested herein on a permanent basis.

***Motion of the Debtor Pursuant to Rule 1007(c) of the Federal Rules of Bankruptcy Procedure for an Extension of Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs***

21. Due to the complexity and diversity of its operations and its limited manpower, the Debtor anticipates that it will be unable to complete its Schedules and Statements in the time required under Bankruptcy Rule 1007(c).

NO KML 889557 v4
2900009-000020

22.     To prepare its required Schedules and Statements, the Debtor and its professionals must compile information from books, records, and documents relating to a multitude of transactions. Collection of the necessary information will require a heavy expenditure of time and effort on the part of the Debtor and its employees.

23.     At the present time, the Debtor anticipates that its will require at least fourteen (14) additional days to complete its Schedules and Statements. The Debtor therefore requests that the Court extend the fourteen (14) day period for an additional fourteen (14) days.

## Conclusion

24.     The Debtor's ability to reorganize successfully is best served by its continued operation as a going-concern. In order to minimize any loss of value to its business, the Debtor's immediate objective is to engage in business as usual following the commencement of this Chapter 11 case, with as little interruption to the Debtor's operations as possible. I believe that if this Court grants the relief requested in each First Day Motion, the prospect for achieving these objectives, to the maximum benefit of creditors and the Debtor's estates, will be substantially enhanced.

Dated: October 2, 2015

_____
Steve P. Ensz
Chief Financial Officer

NO KML 889557 v4
2900009-000020