UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: | : NO. 15-12229 |
| | : |
| **AMERICAN NATURAL ENERGY** | : **Chapter 11** |
| **CORPORATION,** | : |
| | : **Section A** |
| Debtor. | |

### MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION SECURED FINANCING, (II) GRANTING PRIMING LIENS AND SUPER-PRIORITY CLAIMS TO POST-PETITION LENDER, (III) AUTHORIZING USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION, (IV) MODIFYING AUTOMATIC STAY, AND (V) APPROVING NOTICE PROCEDURES

NOW INTO COURT, through undersigned counsel, comes American Natural Energy Corporation ("ANEC" or "Debtor"), the debtor and debtor-in-possession, which files this Motion for Interim and Final Orders (I) Authorizing Debtor to Obtain Post-Petition Secured Financing, (II) Granting Priming Liens and Super-Priority Claims to Post-Petition Lender, (III) Authorizing Use of Cash Collateral and Granting Adequate Protection, (IV) Modifying Automatic Stay, and (V) Approving Notice Procedures (the "Motion").  In support, the Debtor represents:

**Preliminary Matters**

1.

This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (K), (M), and (O).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.

On August 31, 2015, four petitioning creditors filed an involuntary petition for relief (the "Petition") (P-1) under chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") against ANEC.  After obtaining a consensual extension of time to answer the Petition, ANEC filed its voluntary conversion to a debtor in possession case on October 2, 2015.  No committee has been appointed in this chapter 11 case (the "Case").  Further, no trustee or examiner has been requested or appointed in this Case.  Debtor continues to manage and operate its business as Debtor-in-Possession pursuant to 11 U.S.C. §§ 1107 and 1108.

**Introduction**

3.

ANEC is in the oil and gas business, but currently has no production or revenues.  Thus, the Debtor's estate will suffer immediate and irreparable harm if Debtor does not obtain immediate access to the proposed Debtor-in-Possession financing from its existing primary secured creditor, Hillair Capital Investments, LP ("Hillair" or "Lender").  Debtor does not have unencumbered cash and needs liquidity to take certain steps to restore production.  Only upon taking such initial steps, in the nature of a workover, can the business even begin to generate revenues and pay operating expenses such as utilities and obligations to employees, vendors, service providers and professionals.

4.

While it is too early to tell whether the ultimate goal of this Case will be reorganization or a sale of assets, in either event these initial workover expenses should be incurred so that the company can once again be a viable going concern.  The Debtor submits that liquidation of the company's asset as currently situated would not yield much if anything to creditors other than Hillair.

5.

1166370.1
NO PHW 892100 v1
2900009-000020

Moreover, the Debtor must continue to be insured and properly maintained.  The Debtor must give adequate assurances to vendors that it can pay for any work undertaken to restore production.  Likewise, employees need to know that they will be paid for their efforts during the Case.  Absent the relief sought in this Motion, the Debtor believes the Case would quickly be converted to one under chapter 7.

6.

Hillair asserts it is owed approximately $4,000,000, and that that debt is secured by a first mortgage on substantially all of the assets of the Debtor.  Notwithstanding the current unpaid indebtedness, which was in default as of the date of the filing of the involuntary petition, Hillair recognizes that a failure to expend the money now to restore production would be highly detrimental to the market value of its collateral and the overall prospects for the estate and its creditors.  Accordingly, Hillair is willing to loan the Debtor up to $1,000,000 in the form of a line of credit.  Among other things, the loan is conditioned upon the appointment of a Chief Restructuring Officer ("CRO").  ANEC and Hillair have agreed upon the CRO candidate and a separate motion has or will be filed regarding approval/ratification of that appointment.  The loan would carry a 12% interest rate and would be secured by a priming super-priority lien and administrative expense claim on all the assets of the Debtor, except for any avoidance action proceeds.

7.

The Debtor believes it would be futile, under the circumstances, to pursue alternative post-petition financing in the form of:  (1) unsecured credit allowable as an administrative expense under § 503(b)(1) of the Code; (2) unsecured credit allowable under §§ 364(a) and 364(b) of the Code; and (3) unsecured credit pursuant to § 364(c) of the Code, on more favorable

- 3 -

terms and conditions from sources other than Hillair.  Indeed, prior to the filing, the Debtor

pursued, in vain, numerous sources of financing.

8.

Accordingly, the Debtor is requesting authority to obtain post-petition financing from

Hillair to fund the Debtor's efforts to restore production and its continued operations in chapter

11 on the terms set out in detail below, stated more formally in that certain Super-Priority Debtor

in Possession Credit Facility ("Term Sheet") (Exhibit 1 hereto), a draft Revolving Loan

Agreement (Exhibit 2 hereto) and in the proposed Interim Order attached hereto as Exhibit 3,

with those loan obligations to be secured by the reasonable protection proposed in the Interim

Order, including a first priority "priming" lien on all or substantially all of the Debtor's assets

and super-priority administrative expense claims.

**Cash Flow Needs**

9.

Since November 2014, Debtor has been operating without access to additional funding.

The Debtor's oil and gas properties, held by that certain Oil, Gas and Mineral Lease dated

November 14, 1941, executed by Delta Securities Company, Inc., as Lessor, in favor of Gulf

Refining Company, as Lessee, and commonly referred to as the Bayou Couba Field in St.

Charles Parish, Louisiana, have been shut in since February 27, 2015.  Significant oil and gas

liens and/or judgments, both in number and amount, encumber the assets of the Debtor.  A listing

of the known encumbrances is attached hereto as Exhibit 4.

10.

During its efforts to raise additional capital and to address it financial problems, the

Debtor made attempts to resolve these liens for a discount.  Those efforts were unsuccessful. The

Debtor needs cash in the short run to pay the necessary costs to restore production in the Bayou

- 4 -

Couba Field.  The Debtor and Hillair have agreed upon a budget for the first 60 days of the Case, where it is estimated that almost $900,000 will be required to restore production and put the Debtor in position to pay its ongoing operating expenses from revenues during the remainder of the Case.

11.

Given that ANEC has several secured or partially-secured creditors, including most notably Hillair, it could not inject additional funds at a senior debt level even if such funds were available.  For that reason, Debtor has no choice but to seek short-term financing through Hillair.

**Basis for Relief**

12.

The Debtor brings this Motion on an expedited basis to avoid the immediate and irreparable harm that will be suffered by its estate if the Debtor does not obtain the liquidity needed to, among other things, fund a workover to restore production.  The Debtor needs immediate access to both cash collateral and the proposed interim financing.

13.

Bankruptcy Rule 4001(b) provides, among other things, that the court may conduct a preliminary hearing to authorize the use of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.  The Debtor requests an expedited hearing on Wednesday, October 7, 2015, at 10:30 a.m. Central Time, and, to the extent permissible, a final hearing no later than October 23, 2015.

14.

The Debtor has determined that it would not be able to obtain alternative financing on terms superior to the terms of the DIP loan and such terms are market terms that represent the

- 5 -

best terms reasonably available to ANEC.  Indeed, ANEC believes that it would not be able to

obtain financing from any one on any terms, at least on such short notice as is required here.

### Proposed DIP Financing

### 15.

ANEC is proposing to enter into the credit agreement with Hillair pursuant to which

ANEC would be authorized to borrow up to a total of $1,000,000.00.  This proposed borrowing

capacity would be subject to the terms and conditions of the budget, the loan documents, the

Interim Order, and, as applicable, a Final Order, all to be secured by a first position super-

priority administrative expense claim and a first priority priming lien on all property of ANEC's

estate.

### Relief Requested

### 16.

By this Motion, ANEC seeks entry of an interim order ("Interim Order") substantially in

the form of Exhibit 3 hereto, and, after notice and a final hearing, a final order ("Final Order")

(together with the Interim Order, collectively, the "DIP Orders"), otherwise acceptable to Hillair:

A.   Authorizing ANEC to obtain senior Debtor-in-Possession financing up to an
     aggregate principal amount of $1,000,000.00 on an interim and final basis
     provided all interim and final borrowings shall be pursuant to a budget, attached
     hereto as Exhibit 5, and approved by Hillair (as amended, modified or
     supplemented from time-to-time with court approval).

B.   Authorizing ANEC to execute, enter into and perform all such documents,
     instruments and agreements (including, without limitation, the Term Sheet
     (Exhibit 2) and the DIP Revolving Loan Agreement (Exhibit 3) (collectively "the
     Loan Documents") as are required to implement the terms of the DIP Orders, and
     to perform such other and further acts as may be required in connection with the
     Loan Documents;

- 6 -

C.     Granting security interests, liens and super priority claims (including a super priority claim pursuant to § 364(c)(1) of the Bankruptcy Code) in favor of Hillair to secure the obligations under the Loan Documents.  With regard to these advances, ANEC proposes to subordinate Hillair's pre-petition claim, which has a first position on the Debtor's assets, as well as any and all liens or claims of privilege against the assets;

D.     Modifying the Automatic Stay imposed by § 362 of the Bankruptcy Code as required to permit (i) ANEC and Lender to implement the terms of the DIP Orders, (ii) Lender, upon the occurrence and during the continuance of an event of default described herein to exercise all rights and remedies in the Loan Documents, the Interim Order and, as applicable, the Final Order; and

E.     Scheduling a final hearing to be held no earlier than fourteen days after entry of the Interim Order and no later than twenty-eight days after the Order for Relief, to consider entry of the Final Order; and

F.     Approving certain notice procedures for the hearings hereon.

**Summary of Principal Terms of DIP Financing**

17.

| Provision | Terms |
|---|---|
| Borrower | American Natural Energy Corporation (the Debtor) |
| Lender | Hillair Capital Investments, LP (the Lender) |
| Amount | Up to $1,000,000.00, subject to Bankruptcy Court approval (the DIP Loan) |
| Interest Rate | 12% per annum |
| Default Interest Rate | 17% per annum |
| Fees and Expenses/CRO | A closing fee equal to $50,000 payable to Hillair Capital Management, LLC on the Closing Date, which shall be netted from the loan proceeds advanced.  An annual collateral monitoring fee equal to $10,000 payable in quarterly installments to Hillair Capital Management, LLC, with the first quarterly payment made on the Closing Date and thereafter on each three month anniversary thereof until termination of the Facility.  The Debtor shall pay also pay the expenses of the Lender including, without limitation, the reasonable fees and disbursements of all legal, environmental and other consultants incurred in connection with the preparation, negotiation, and monitoring of the DIP Revolving Loan and any amendments thereto.  The Debtor must consent to the appointment of a CRO |

- 7 -

| | |
|---|---|
| | acceptable to Lender. |
| Maturity | The loan will mature on April 2, 2016, or six months after the date the involuntary bankruptcy was converted to a voluntary chapter 11 proceeding.  It is contemplated that the Debtor shall repay the outstanding advances and loan under the DIP Loan on the effective date of the Plan of Reorganization. |
| Liens, Collateral, and Priority (Bankruptcy Rule 4001(c)(1)(B)(i), (vii), and (xi) | Lender will receive pursuant to § 364(d)(1) of the Bankruptcy Code a fully perfected first priority lien upon the collateral consisting of working interests in oil and gas leases, inventory, accounts receivable, the real property, plant and equipment of the Debtor, together with all proceeds, products, accessions or substitutions, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering or relating to any of the foregoing, to the particular liens being subordinated under 11 U.S.C § 364(d). The collateral also includes any and all rights, claims, and other causes of action of the Debtor's estate (including any actions asserted by the Debtor or any subsequently appointed Trustees or representatives of the Debtor's estate under any section of the Bankruptcy Code), and in each case, all proceeds resulting therefrom, including avoidance actions under §§ 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code. |
| Securities; Perfection | All obligations of the Debtor under and with respect to the DIP Loan (the DIP Obligations) shall also receive and be entitled to, pursuant to § 364(c)(1) of the Bankruptcy Code, a super priority administrative expense claim (the Super Priority Claim) over all other costs and expenses of the kind specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code, subject only to the Carve Out (defined below).

All of the above-described security interest shall be deemed created and fully perfected upon entry of the Interim Order to the extent of events as made pursuant to it, and upon entry of the Final Order to the extent of advances thereafter, without the need for any additional documentation, provided that the Debtor shall cooperate with Lender to execute and record further documentation satisfactory to the Lender of the Security Interests created and authorized in the collateral.  If Lender should choose to file financing statements, mortgages or other documents, or otherwise confirm perfection of such liens, the Automatic Stay of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the filing of all such financing statements, mortgages, or similar documents. |
| Events of Default | An event of default under the DIP Loan shall occur if:  a) Debtor (i) fails to make any payment of principal of, or interest on, the Loans or any other the DIP Obligations when due and payable or (ii) fails |

1166370.1
NO PHW 892100 v1
2900009-000020

to pay or reimburse Lender for any expense reimbursable under the DIP Revolving Loan Agreement or under any other Loan Document within 10 days following Lender's demand for such reimbursement or payment of expenses.    b) Debtor fails or neglects to perform, keep or observe any provision of the DIP Revolving Loan Agreement, the Note, or any other Loan Documents; c) Any representation or warranty made by Debtor in the DIP Revolving Loan Agreement or in any of the Loan Documents, any financial statement, or any statement or representation made in any other certificate, report or opinion delivered in connection therewith proves to have been incorrect or misleading in any material respect when made; d) There occurs any uninsured damage to or loss, theft or destruction of any portion of the Collateral that could reasonably be expected to have a Material Adverse Effect; e) Debtor breaches or violates any terms of the Interim Order or the Final Order; f) Debtor uses Operations Advances for purposes not authorized by the Bankruptcy Code or the United States Bankruptcy Court for the Eastern; g) the CRO is no longer the responsible person involved in the day-to-day management of the Debtor, or any of the economic or voting rights associated with the stock of Debtor is no longer owned and controlled by the persons with such ownership and control as of the Petition Date, or unless the Lender consents; h) The creation, existence or allowance of any non-ordinary course indebtedness, whether recourse or non-recourse and whether superior or junior, resulting from borrowings, loans, advances, or the granting of credit, whether secured or unsecured, except (i) Indebtedness to Lender arising under or as a consequence of the DIP Revolving Loan Agreement or the other Loan Documents and ii) Indebtedness existing on the Petition Date or otherwise expressly permitted under the DIP Loan Agreement or the orders of the United States Bankruptcy Court for the Eastern District of Louisiana; i) The creation, existence or allowance of any Liens on any of the Debtor's properties or assets except the Liens existing as of the Petition Date and the Liens created or permitted under the DIP Revolving Loan Agreement or the orders of the United States Bankruptcy Court for the Eastern District of Louisiana; or j) The occurrence of any of the following in the Case:  i) the bringing of a motion, taking of any action or the filing of any Plan of Reorganization or Disclosure Statement attended thereto by Debtor; to sell any assets of the Debtor through a sale under § 363 of the Bankruptcy Code; to obtain additional financing under § 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to the DIP Revolving Loan Agreement; to grant any Lien upon or affecting any collateral; or any other action adverse to Lender or its rights and remedies hereunder or its interest in the Collateral; ii) the entry of an order amending, supplementing, staying, vacating or otherwise modifying

1166370.1
NO PHW 892100 v1
2900009-000020

| | |
|---|---|
| | the Loan Documents, the Interim Order, of the Final Order without the written consent of Lender, or the filing of a motion for reconsideration with respect to the Interim Order or the Final Order; iii) the Final Order is not entered immediately following the expiration of the Interim Order; iv) the payment of or application for authority to pay, any pre-petition claim without Lender's prior written consent or pursuant to an order of the Bankruptcy Court after notice and hearing unless otherwise permitted under the DIP Revolving Loan Agreement; v) the allowance of any claim or claims under § 506(c) of the Bankruptcy Code against or with respect to any of the Collateral; vi) the appointment of an Interim or Permanent Trustee in the case or the appointment of an examiner in the case; or the sale without Lender's consent of all of the Debtor's assets either through a sale under § 363 of the Bankruptcy Code, through a Confirmed Plan of Reorganization in the case, or otherwise that does not provide for payment in full of the Obligations and termination of Lender's commitment to make the Advances; vii) the dismissal of the Case, or the conversion of the Case from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or the filing of a motion or other pleading by the Debtor seeking the dismissal of the case under § 1112 of the Bankruptcy Code or otherwise; viii) the entry of an order by the Bankruptcy Court granting relief from or modifying the Automatic Stay to allow any creditor to execute upon or enforce a Lien on any Collateral; ix) the commencement of a suit or action against Lender and, as to any suit or action brought by any person other than the Debtor or a subsidiary, officer or employee of the Debtor, a continuation thereof without dismissal for 30 days after service thereof on Lender, that asserts by or on behalf of Debtor, the Environmental Protection Agency, any state environmental protection or health and safety agency, or any official committee in the Case, any claim or legal or equitable remedy which seeks subordination of the Claim of Lender; or x) the entry of an order in the Case granting any other super priority claim or Lien equal to or superior to the Claims and Liens granted to Lender. |
| Automatic Stay (Bankruptcy Rule 4001(c)(1)(B)(iv) | The Automatic Stay of Bankruptcy Code § 362 shall be vacated and modified to the extent necessary to permit Lender to take, upon the occurrence and during the continuance of any Event of Default, any or all of the following actions:  a) cease making any loans under the DIP Revolving Loan Agreement; b) declare all obligations under the DIP Revolving Loan Documents to be immediately due and payable; and c) charge the Default Rate of Interest as provided for under the DIP Revolving Loan Agreement.<br><br>In addition, so long as Lender has provided 10 days prior written notice to Debtor, with a copy to counsel for any official creditors committee appointed in the Case (or to borrowers' 20 largest |

1166370.1
NO PHW 892100 v1
2900009-000020

| | |
|---|---|
| | creditors in the event no such committee has been appointed or is in existence and the United States Trustee for the Eastern District of Louisiana), Lender may take any other action or exercise any other right and remedy available to it under the Loan Documents or otherwise available at law or in equity with the Automatic Stay being deemed lifted on the filing of an ex parte motion and order with the U.S. Bankruptcy Court for the Eastern District of Louisiana citing the defaults under the Terms of the DIP Loan. |
| Limitation on Use of Proceeds (Bankruptcy Rule 4001(c)(1)(B)(viii) | No portion of the DIP Revolving Loan, or the Collateral securing the same, or the Carve Out are to be used by any party or professional to assert causes of action against the Lender, including but not limited to with respect to Lender's rights and remedies under the DIP Revolving Loan. |
| Professional and Statutory Fee Carve Out | The Carve Out shall consist of a) the fees of the U. S. Trustee pursuant to 28 U.S.C. § 1930(b) in the event of a conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, in an aggregate amount not to exceed $5,000, b) the fees and expenses incurred by counsel for the petitioning creditors in placing ANEC into an involuntary bankruptcy, in an aggregate amount not to exceed $12,000, and c) any unpaid fees, costs and expenses that were accrued or incurred, following the Occurrence or and during the continuation of an Event of Default, by the professionals retained by the Debtor or the professionals retained by any official unsecured creditors committee, in each case to the extent allowed by an Order of this Court, in an aggregate amount not to exceed $108,000, provided that any payments actually made to such professionals by Order of the Bankruptcy Court after the Occurrence of an Event of Default on account of fees and expenses actually incurred after the Occurrence of such an Event of Default shall reduce such amount on a dollar-for-dollar basis.  In the aggregate, the Carve-Out shall not exceed $125,000 without approval by Hillair. |
| Indemnification (Bankruptcy Rule 4001(c)(1)(B)(ix) | Debtor shall indemnify and hold harmless the Lender, and Lender's directors, officers, employees, affiliates, attorneys and agents in connection with the Loan. |

18.

Section 364 of the Bankruptcy Code authorizes this court to allow ANEC to obtain post-petition financing in the manner proposed.  As security for all obligations owed under the DIP Revolving Loan, ANEC proposes to grant Hillair, subject to the Carve Out, a super priority claim

and perfected first priority security interest and liens on all collateral securing the obligations under the Loan Documents to the extent it is property of ANEC's estate.

**The Court Should Permit the Debtor's Use of Cash Collateral**

19.

Section 363(c)(2) of the Bankruptcy Code provides that debtors may not use, sell, or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court after noticing the hearing, authorizes such use, sale or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  "Cash collateral" is defined to mean "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest."  11 U.S.C. § 363(a).

20.

At this time, ANEC does not know if its secured creditors, other than Hillair, with an interest in cash collateral will consent to ANECS's use of cash collateral.  Absent such consent, ANEC intends to provide adequate protection consistent with § 364(d) of the Bankruptcy Code. ANEC maintains, and will present testimony at the hearing, that the DIP Revolving Loan enhances significantly the going concern value of ANEC necessary to maximize ANEC's reorganization prospects.  Enhancing the current going concern value of the assets also makes it an attractive sale prospect in the event ANEC's reorganization efforts are unsuccessful. Without the DIP Loan, the Debtor's assets will most likely have to be sold for liquidation or "fire sale" value.  ANEC maintains that the diminution in value that would be caused by immediate liquidation would be far greater than the protections provided to the prospective DIP Loan. Moreover, ANEC will present testimony at the hearing that its current priming secured creditors

- 12 -

will be adequately protected by the value of the collateral despite the proposed subordination of its interests.

21.

Generally, §§ 364(c) and (d) of the Bankruptcy Code require Debtor to demonstrate that alternative sources of post-petition credit are not available under §§ 364(a) or (b) of the Bankruptcy Code. However, where few lenders are likely, able or willing to extend the credit required, it would be unrealistic and unnecessary to require ANEC to conduct an exhaustive search for financing. *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. GA 1988).

22.

The universe of lenders who could commit to meet ANEC's post-petition financing requirements is limited. Given ANEC's financial condition and existing financing arrangements, ANEC determined, in consultation with its advisors, that it would not be able to obtain unsecured credit or other financial accommodations allowable as an administrative expense under § 503(b)(1) of the Bankruptcy Code. DIP financing is not otherwise available without ANEC granting the super priority and administrative protections sought herein. Indeed, it would be impossible for ANEC to even provide the adequate assurances to its professionals in order to attempt reorganization without this DIP financing.

23.

ANEC negotiated the best financing arrangement that it can reasonably expect under the circumstances. The fees are, upon information and belief, customary and reasonable, and courts routinely authorize similar lender incentives beyond the explicit liens and rights specified under § 364 of the Bankruptcy Code. See, e.g., *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316

- 13 -

(9th Cir. Bap. 1992). Moreover, the alternatives are dire; without additional liquidity, ANEC cannot restore production and will be forced to dismiss the case or convert to chapter 7.

24.

Based on the foregoing, ANEC requests that the court approve the DIP Revolving Loan in accordance with the terms in the proposed DIP Order.

**Hillair is Entitled to the Good Faith Protection of § 364(e) of the Bankruptcy Code**

25.

The terms and conditions of the proposed loan are fair and reasonable. Such terms and conditions were negotiated in good faith and at arm's length at all times by ANEC, Hillair, and their respective advisors. ANEC and Lender conducted good faith arm's length negotiations concerning the budget and the terms of certain "first day" pleadings that require the appointment of a CRO, the immediate use of cash collateral and access to interim financing being offered by Lender.

26.

In light of the foregoing, Hillair should be afforded the benefits and protections of § 364(e) of the Bankruptcy Court with respect to the DIP Revolving Loan; specifically, any loans, advances or other financial accommodations that Lender makes or causes to be made from time to time to ANEC on the terms and conditions set forth in the DIP Revolving Loan should be conclusively deemed to have been made and provided "in good faith" as the term is used in § 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of § 364(e) of the Bankruptcy Code in the event that the DIP Orders or DIP Revolving Loan or any provisions are hereafter modified, vacated, amended or stayed by subsequent order of this court or any other court without the express consent of Lender.

**Modification of Automatic Stay**

1166370.1
NO PHW 892100 v1
2900009-000020

27.

The DIP Loan and the proposed DIP Order contemplate a modification of the automatic stay to the extent applicable and necessary, to permit Hillair and ANEC to implement the terms of the DIP Orders and, upon the occurrence and during the continuance of an Event of Default, to permit Lender to exercise all rights and remedies in the Loan Documents and the Interim Order. The provisions of this kind are standard in debtor possession financing and are reasonable under the circumstances.

**Establishing Notice Procedures and Request for Final Hearing**

28.

Pursuant to Bankruptcy Rule 4001(b)(2), the court may commence a final hearing no earlier than 14 days after service of the Motion. ANEC shall, within three business days of the entry of the Interim Order by the court, serve by overnight mail, a copy of the Interim Order and a notice of the final hearing to consider entry of the Final Order on the date established by the court. ANEC requests the court require any party in interest objecting to the relief sought at the final hearing to serve and file objections, which objection shall: (i) be in writing; (ii) conform to the bankruptcy rules and the local rules; and (iii) be filed with the Clerk of the United States Bankruptcy Court for the Eastern District of Louisiana no later than seven days before the final hearing and served upon counsel to ANEC and counsel to Hillair so as to be received not less than seven days before the Final Hearing.

29.

ANEC requests the court schedule the Final Hearing no later than October 23, 2015, and approve the proposed notice and objection procedures for the Final Hearing set forth herein.

**Notice and Prior Motions**

30.

1166370.1
NO PHW 892100 v1
2900009-000020

ANEC shall serve the Motion by  mail, , by email with PDF attachment or by facsimile on i) Hillair Capital Investments, LP through its counsel of record ii) all know lien claimants; iii);   the holders of the 20 largest unsecured claims against ANEC's estate; iv ) the Internal Revenue Service; v) the Securities and Exchange Commission; vi) the U.S. Trustee, and vii) any party who has formally appeared and requested service in these proceedings pursuant to Bankruptcy Rule 2002.

31.

In light of the nature of the relief requested herein, ANEC submits that no other and further notice of the motion is necessary or required.

32.

No previous request for the relief sought has been made to this or any other court.

WHEREFORE, the Debtor requests that the court enter the Interim Order, schedule the Final Hearing and, after notice and the Final Hearing, enter the Final Order, and grant the Debtor such other relief as is just and equitable under the circumstances.

Respectfully submitted,

By:     */s/ Jan M. Hayden*

Jan M. Hayden (La #06672)
Edward H. Arnold, III (La #18767)
Patrick H. Willis (La #36088)
**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana   70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000

**ATTORNEYS FOR AMERICAN
NATURAL ENERGY CORPORATION**

- 16 -

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of October, 2015, a copy of the foregoing electronically filed pleading was served via mail, facsimile, or electronic mail to all parties listed on Exhibit A attached hereto.


/s/ Jan M. Hayden
Jan M. Hayden

1166370.1
NO PHW 892100 v1
2900009-000020

**EXHIBIT 1**

DRAFT

SUPER-PRIORITY DEBTOR IN POSSESSION CREDIT FACILITY

Term Sheet
October __, 2015

This Term Sheet is delivered from Hillair Capital Investments L.P. ("Lender") to American Natural Energy Corporation, an Oklahoma corporation (the "Borrower") for a Super-Priority Debtor in Possession Credit Facility (the "Facility"), as evidenced by that certain Revolving Loan Agreement.

It is understood and agreed that Lender's interest in making the advances contemplated under the Facility is predicated upon the terms relating to a plan of reorganization or liquidation (a "Plan") under chapter 11 of the Bankruptcy Code, 11 U.S.C. § § 101, et seq. (the "Bankruptcy Code"), or the sale of substantially all of Borrower's assets pursuant to section 363 of the Bankruptcy Code (a "363 Sale").

From the date of execution of this Term Sheet until entry of the DIP Order (defined below) by the Bankruptcy Court, the Borrower, and its directors, employees, advisors, and other representatives and agents shall not solicit interest from, and shall discontinue all discussions and other communications with, potential financing sources or other parties regarding financing or other strategic transactions and will not respond to unsolicited proposals from such parties.

This Summary of Terms and Conditions ("Summary of Terms") is intended as an outline of certain of the material terms of the Facility and does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions which would be contained in definitive documentation for the Facility contemplated hereby.

---

**I.    Parties**

| | |
|---|---|
| Borrower(s): | American Natural Energy Corporation, an Oklahoma corporation |
| Guarantors: | N/A |
| DIP Lender: | Hillair Capital Investments L.P. |
| Pre-Petition Lender: | Hillair Capital Investments L.P. |
| Other Potential Secured Creditors: | Multiple Lien/Judgment Filings (See Exhibit A hereto) |

**II.    Proposed Facility**    A maximum $1,000,000 term loan facility (the "Term Loan Facility" and the loans thereunder, the "Term Loan").

| | |
|---|---|
| Term Loan Availability: | The Term Loan shall be made available in draws pursuant to written requests acknowledged and consented to in writing by the Chief Restructuring Officer (CRO) (as defined below) (the "Advances"). |
| Purpose: | The proceeds of the Term Loan will be used (a) to finance the Debtor's estimated oil and gas workover efforts designed to restore production in the early phases of the bankruptcy, all in accordance |

with the DIP Budget (as defined below), and subject to the approval of the CRO, subject further to the expenditure variances referenced below under the heading "Affirmative Covenants" and (b) to pay the fees, costs and expenses incurred by the Debtors in connection with their chapter 11 bankruptcy cases, which will be converted on or about October 2, 2015 from an involuntary petition to a voluntary chapter 11 proceeding in the United States Bankruptcy Court for the Eastern District of Louisiana (the "Bankruptcy Court").    The bankruptcy case bears docket number 15-12229.

## III.    Certain Payment Provisions

Fees and Interest Rates:    As set forth on Annex I.

Mandatory Prepayments:    In addition to any scheduled installments due on the loans under the Facility, the Revolving Loan Agreement will contain a standard mandatory prepayment provision which will include a prepayment of amounts outstanding under the Facility upon a 363 Sale or transfer of assets of the Borrower or any of its subsidiaries, or confirmation of a Plan, at the option of the Lender.

Credit Bid:    The Revolving Loan Agreement will contain provisions allowing Lender to credit bid any amounts outstanding under the Facility, as well as amounts due Lender on a pre-petition basis, against the purchase price for the Debtors' assets in a 363 Sale.

## IV.    Collateral and Other Credit Support

Collateral:    The Facility will be secured by a senior secured lien and security interest in all of the assets of the Borrower, whether consisting of real, personal, tangible or intangible property (collectively, the "DIP Liens"), other than avoidance actions under sections 544, 547, or 548 of the Bankruptcy Code (collectively, the "Collateral").

Pursuant to section 364(c)(2) of the Bankruptcy Code, the Lender will be granted and shall have a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon any and all Collateral that is not subject to valid, perfected, non-avoidable and enforceable liens in existence as of the Petition Date or valid liens in existence as of the Petition Date that are perfected subsequent to such date to the extent permitted by section 546(b) of the Bankruptcy Code.

Pursuant to section 364(d)(1) of the Bankruptcy Code, the Lender will be granted and shall have a valid, binding, continuing, enforceable, fully-perfected first priority, priming senior security interest in and lien upon all Collateral that is subject to pre-petition liens securing the pre-petition obligations and all other security interests and liens on the Collateral (other than the liens of the Lender), except with respect to any valid, perfected and unavoidable interests in such property arising out of liens to which the holders of pre-petition liens become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

The DIP Liens granted to the Lender shall be senior to and shall not be subject or subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (b) subject to applicable law, any liens arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors other than as expressly permitted under the Facility. The DIP Liens are subject only to the Carve-Out (defined below).

The Lender will be granted an allowed super-priority administrative claim (the "DIP Lender Super-priority Claims") in accordance with section 364(c)(1) of the Bankruptcy Code, having a priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors (including, but not limited to, the pre-petition obligations, which for avoidance of doubt are not entitled to treatment as an ordinary or super-priority administrative claim except to the extent of any Adequate Protection Claim, as defined below, for diminution in value or as adequate protection for priming by the Facility), now in existence or hereafter incurred by the Debtors and over any and all administrative expenses or priority claims of any kind including as specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b) (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code, whether arising in the Debtor's chapter 11 cases or in any superseding chapter 7 case concerning the Debtors. The DIP Lender Super-priority Claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof, except so-called avoidance action proceeds.

Lender's DIP Liens and claims under the Facility shall be subject to a "Carve-Out" for (a) the allowed fees and expenses of the Debtor, a one-time payment to the involuntary petitioning creditors for expenses, including attorneys' fees, associated with involuntary filing, and any Official Committee of Unsecured Creditors' retained professionals in the Debtor's bankruptcy case in an amount acceptable to Lender, and (b) the fees required to be paid to the Clerk of Court and U.S. Trustee pursuant to 28 U.S.C. § 1930, provided that, in no event shall the total carve-out exceed $125,000. To avoid doubt, the retainer paid to the proposed counsel for the Debtor prior to the conversion of the case to a voluntary chapter 11 is not included in the Carve-Out limit of $125,000.

Adequate Protection to
Pre-Petition Lender:

The Pre-Petition Lender will be granted a replacement lien (the "Replacement Liens") subject to (a) unavoidable, duly perfected liens existing as of the Petition Date. The Replacement Lien granted to the Pre-Petition Lender will be: (a) prior and senior to all liens and encumbrances (other than fees arising under 28. U.S.C. §1930) of all other secured creditors in and to such property granted, or arising, subsequent to the date of the Interim Order; (b) any security interest or lien that is avoided or otherwise preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code; and (c) junior and subordinate to the Carve-Out and the DIP Liens granted to the Lender, to which the Replacement liens shall be immediately junior and subordinate.

The claims of the Pre-Petition Lender for any diminution in the value of its interests in the pre-petition Collateral of the Debtors (the "Pre-Petition Collateral") from the Petition Date resulting from (a) the use, sale, lease, disposition, shrinkage, decline in market value, consumption or physical deterioration of the Pre-Petition Collateral by the Debtors, and (b) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code shall constitute allowed claims against the Debtors with priority over all administrative expenses (other than any fees arising under 28 U.S.C. § 1930), diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (collectively, the "Pre-Petition Lender Super-priority Claims"), whether or not such expenses or claims may become secured by judgment lien or other non-consensual lien, levy, or attachment or otherwise, which allowed Pre-Petition Lender Super-priority Claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof; provided, however, that the Pre-Petition Lender Super-priority Claims granted to Pre-Petition Lenders shall be junior and subordinate to the Carve-Out and the DIP Lender Super-priority Claims.

The Pre-Petition Lender may reserve its rights to seek additional adequate protection; provided that any adequate protection provided shall be junior and subordinate to the DIP Liens, the Carve-Out and DIP Lender Super-priority Claims; and

Subject to and in accordance with the DIP Budget, the Pre-Petition Lender shall receive payment of interest on the Pre-Petition Obligations in accordance with the pre-petition loan documents.

**Adequate Protection to Other**

| Secured Creditors: | **The Debtor anticipates filing an adversary proceeding in the** |
|---|---|
| | **Bankruptcy Case to determine the validity, extent and priority of certain liens and judgments. Those interests will receive replacement liens depending on the ultimate determination by the Bankruptcy Court in that proceeding.** |

## V.    Certain Conditions

| Advance Conditions: | The availability of the Facility shall be conditioned upon satisfaction of, among other things, the following conditions precedent (the date upon which all such conditions precedent shall be satisfied, the "Closing Date") on or before November 15, 2015: |
|---|---|

(a)      The Borrower shall have executed and delivered satisfactory definitive financing documentation with respect to the Facility, including a revolving loan agreement (the "Revolving Loan Agreement"), security documents and other legal documentation (collectively, together with the Credit Agreement, the "Loan Documents") satisfactory to the Lender.

(b)      All governmental and third party approvals necessary in connection with the financing contemplated hereby and the continuing operations of the Borrower and its wholly-owned subsidiaries (including shareholder approvals, if any) shall have been obtained on satisfactory terms and shall be in full force and effect.

(c)      Lender shall have received (at the Borrower's expense) and be satisfied with the Borrower's unaudited financial statements for the most recently completed fiscal periods and the Borrower's most recent 13-week cash flow budget.

(d)      The Lender shall have received such closing documents as are customary for transactions of this type or as it may reasonably request, all in form and substance reasonably acceptable to the Lender and its counsel.

(e)      The corporate structure, capital structure, other debt instruments, material accounts, and governing documents of the Borrower and its wholly-owned affiliates, shall be acceptable to the Lender at the time of closing.

(f)      Entry of a Final Order by the Bankruptcy Court approving the Facility, on terms and conditions consistent with this Term Sheet and acceptable to Lender in its sole discretion, including customary waivers and protections (the "DIP Order"). Pending the final hearing and entry of the DIP Order, the Debtors will enter into, and implement on an interim basis, the Facility and Loan Documents in accordance with an Interim Order. All DIP Liens and Replacement Liens granted for the benefit of the Lender and the Pre-Petition Lenders shall be valid enforceable and deemed perfected, effective

upon the entry of the Interim Order, and no further action shall be required to effect such perfection.

## VI.   Certain Documentation Matters

|  |  |
|---|---|
| | The Loan Documents shall contain representations, warranties, covenants and events of default customary for financings of this type and other terms deemed appropriate by the Lender, including, without limitation: |
| Representations and Warranties: | Financial statements; no material adverse change; existence and standing, authorization and validity; compliance with law; corporate power and authority; enforceability of Loan Documents; no conflict with law; no default; ownership of property; intellectual property; taxes; insurance; ERISA; and accuracy of disclosure. |
| Affirmative Covenants: | Payment of obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws; maintenance of property and insurance; maintenance of books and records; right of the Lender to reasonable inspection of property and books and records; notices of defaults, litigation and other material events; compliance with environmental laws; depository banks, casualty and condemnation; and use of proceeds. |
| Negative Covenants: | Limitations (subject to exceptions, as appropriate, to be negotiated) on: indebtedness; liens; consolidations, liquidations and dissolutions; payment of restricted payments (including dividends and other payments in respect of capital stock); investments (including acquisitions), loans and advances; transaction with affiliates; changes in fiscal year; negative pledge clauses; and amendment of material documents; _provided_, _however_, the Loan Documents shall permit sales of assets in the ordinary course of business and other rights and entitlements set forth in this Term Sheet. |
| DIP Budget: | Borrower will comply with the terms of a debtor in possession budget incorporated into the Facility and approved by the Bankruptcy Court, subject to variances to be negotiated by the parties. Expenditures will be approved by the CRO. |
| Events of Default: | Nonpayment, inaccuracy of representations and warranties; violation of covenants; cross-default; certain ERISA events; noncompliance with term relating to the DIP Budget; or if:<br><br>(a) the Debtor's case is either dismissed or converted to a case under chapter 7 of the Bankruptcy Code;<br><br>(b) a trustee or an examiner with expanded powers is appointed in the chapter 11 case; |

(c)  any plan(s) of reorganization of the Debtor is filed which does not provide for the payment in full in cash of the post-petition DIP Term Loan obligations upon the effective date of the plan(s);

(d)  the Debtor ceases operation of its business or takes any material action for the purpose of effecting such cessation without the prior written consent of the Lender;

(e)  the Interim Order is reversed, vacated, stayed, amended, supplemented or otherwise modified in a manner which shall materially adversely affect the rights of the Lender or materially and adversely affects the priority of any or all of the  Lender's claims, liens or security interests and which is not acceptable to the Lender, in its discretion;

(f)  the DIP Order is not entered on or before thirty (30) days after the date of entry of the Order of Relief;

(g)  the Debtor fails to comply with or perform, in any material respect, the terms and provisions of the Interim Order or any DIP Loan Document, including, without limitation, using the Term Loan or cash collateral other than in accordance with the provisions of the Interim Order and the DIP Order;

(h)  any sale or other disposition of Collateral or cash collateral is approved without the consent of the Lender;

(i)  any super-priority claim or lien equal or superior in priority to that granted to the Lender is granted;

(j)  the automatic stay of Bankruptcy Code section 362 is lifted so as to allow a party other than the Lender to proceed against any material asset of any Debtor;

(k)  the Debtor filed, or the Court enters an order confirming, a plan of reorganization, which plan is not in form and substance acceptable to the Lender; or

(l)   any section 363 Sale milestones  are not met within the period specified therefor, as the same may be extended in the sole discretion of the Lender.

Upon an uncured event of default, Lender may immediately seek relief from the automatic stay to exercise its rights and remedies pursuant to the  DIP Loan Documents, the pre-petition loan documents and/or applicable law, including, without limitation, to foreclose on all or any portion of the Collateral, collect accounts receivable and other monies owing to the Debtors and apply the proceeds thereof in satisfaction of the Post-Petition Obligations and the Pre-Petition Obligations.

Plan and/or 363 Sale:     Borrower will (i) file a plan of reorganization/liquidation within 120 days of the date of the order for relief for its chapter 11 case, or (ii) will obtain Bankruptcy Court approval to commence an auction and

sale process, culminating in a 363 Sale by no later than 150 days after the date that it commences its voluntary chapter 11 case; provided, however, notwithstanding the foregoing 150-day deadline with respect to the 363 Sale closing, and the 120-day deadline with respect to the Plan milestone, Borrower's time for completing a Plan or 363 Sale process shall be subject to demonstrating to Lender's reasonable satisfaction through its DIP Budget (as amended) the ability to fund such processes within the contemplated timeframes. Terms relating to the Plan milestone and the 363 Sale closing will be incorporated into the DIP Order.

Expenses:

The Borrower shall reimburse Lender for all actual and reasonable out-of-pocket expenses, including, without limitation, Lender's attorneys' fees and expenses, in connection with the Facility.

Governing Law:

The Loan Documents will be governed by the internal laws of the State of Louisiana.

If you agree to the terms and conditions set forth in this Term Sheet, please sign and return one copy to the Lender.

**LENDER:**

**HILLAIR CAPITAL INVESTMENTS L.P.**

By:_____
Name: _____
Its:_____

**Accepted and Agreed to this __ day of September, 2015**

**BORROWER;**

**AMERICAN NATURAL ENERGY CORPORATION**

By:_____
Name: _____
Its:_____

DRAFT

Annex I

Interest and Certain Fees

| | |
|---|---|
| Interest Rate: | 12% |

Interest Payment Dates:      Interest shall accrue and be due and payable on the earlier of the date of termination of the Facility or the Maturity Date.

Closing Fee:      A closing fee equal to $50,000.00 payable to Hillair Capital Management, LLC on the Closing Date, which shall be netted from the loan proceeds advanced.

Collateral Monitoring Fee:      An annual collateral monitoring fee equal to $10,000.00 payable in quarterly installments to Hillair Capital Management, LLC, with the first quarterly payment made on the Closing Date and thereafter on each three month anniversary thereof until termination of the Facility

Default Rate:      After default, the applicable interest rate will be increased by 5% per annum.

Rate and Fee Basis:      All per annum rates shall be calculated on the basis of a year of 360 days for actual days elapsed.

Maturity:      The Term Loan will mature six (6) months after the involuntary bankruptcy case is converted to a voluntary chapter 11 proceeding, or April 2, 2016 (the "Maturity Date").

**EXHIBIT 2**

DRAFT

## REVOLVING LOAN AGREEMENT

THIS LOAN AGREEMENT (this "Agreement") is made and entered into as of the _____*[number]* day of _____*[month]*, 2015, by and among American Natural Energy Corporation ("Borrower"), an Oklahoma corporation with a principal address of _____ and Hillair Capital Investments, L.P. ("Lender"), a Cayman Islands exempted limited partnership with a principal address of 345 Lorton Avenue, Suite 303, Burlingame, CA 94010.

### WITNESSETH:

WHEREAS, Borrower has applied for a revolving credit facility from the Lender in the aggregate principal amount of up to $1,000,000.00; and

WHEREAS, the Lender is willing to make said revolving credit facility available to Borrower upon, and subject to, the terms, provisions and conditions hereinafter set forth and upon approval of the U.S. Bankruptcy Court for the Eastern District of Louisiana;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower and the Lender hereby mutually covenant and agree as follows:

## SECTION 1. DEFINITIONS

1.01 Definitions. In addition to the terms defined elsewhere in this Agreement or in any Exhibit or Schedule hereto, when used in this Agreement, the following terms shall have the following meanings (such meanings shall be equally applicable to the singular and plural forms of the terms used, as the context requires):

**Borrower's Obligations** shall mean any and all present and future indebtedness (principal, interest, fees, collection costs and expenses, attorney's fees and other amounts), liabilities and obligations (including, without limitation, indemnity obligations) of Borrower to the Lender evidenced by or arising under or in respect of this Agreement.

**Default** shall mean any event or condition the occurrence of which would, with the lapse of time or the giving of notice or both, become an Event of Default.

**Domestic Business Day** shall mean any day except a Saturday, Sunday or legal holiday.

**Event of Default** shall have the meaning ascribed thereto in Section 5.

**Fees** shall mean the closing fee of $50,000 and the annual collateral monitoring fee of $10,000 payable to Hillair Capital Management, LLC on the Closing Date.

**GAAP** shall mean, at any time, generally accepted accounting principles at such time in the United States.

1

**Loan** and **Loans** shall have the meanings ascribed thereto in Section 2.01(a).

**Material Adverse Effect** shall mean:

(a) a material adverse effect on the properties, assets, liabilities, business, operations, prospects, income or condition (financial or otherwise) of Borrower and its Subsidiaries taken as a whole;

(b) material impairment of Borrower's ability to perform any of its obligations under this Agreement, the Note or any of the other Transaction Documents; or

(c) material impairment of the enforceability of the rights of, or benefits available to, the Lender under this Agreement, the Note or any of the other Transaction Documents.

**Notice of Borrowing** shall have the meaning ascribed thereto in Section 2.02.

**Person** shall mean any individual, sole proprietorship, partnership, joint venture, limited liability company, trust, unincorporated organization, association, corporation, institution, entity or government (whether national, Federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

**Rate** shall mean the interest rate for the Revolving Credit Facility, or specifically, a fixed rate of 12% per annum  prior to default.  After default, with a failure to timely cure same, "Rate" shall mean the default rate of 17% per annum.

**Revolving Credit Commitment** shall mean a maximum amount of $1,000,000.00.

**Revolving Credit Period** shall mean the period commencing on the date of this Agreement and ending on the date of Confirmation of a Chapter 11 Plan or Dismissal or Conversion of Borrower's Chapter 11. Unless agreed upon in writing by the Lender, the maximum term shall be six months from the entry of the Order for Relief, or April 2, 2016.

**Transaction Documents** shall mean this Agreement and any and all other agreements, documents and instruments heretofore, now or hereafter delivered to the Lender with respect to or in connection with or pursuant to this Agreement, any Loans made hereunder or any of the other Borrower's Obligations, and executed by or on behalf of Borrower, all as the same may from time to time be amended, modified, extended, renewed or restated.

## SECTION 2. THE LOANS

2.01 Revolving Credit Commitment.

(a) Subject to the terms and conditions set forth in this Agreement and so long as no Default or Event of Default has occurred and is continuing, during the Revolving Credit Period, the Lender agrees to make such loans to Borrower (individually, a "Loan" and collectively, the "Loans") as Borrower may from time to time request pursuant to Section 2.02. The aggregate principal amount of Loans which the

Lender shall be required to have outstanding under this Agreement as of any date shall not exceed the Revolving Credit Commitment. Within the foregoing limits, Borrower may borrow under this Section 2.01(a), prepay under Section 2.07 and re-borrow at any time during the Revolving Credit Period under this Section 2.01(a). All Loans not paid prior to the last day of the Revolving Credit Period, together with all accrued and unpaid interest thereon and all fees and other amounts owing by Borrower to the Lender with respect thereto, shall be due and payable on the last day of the Revolving Credit Period.

2.02 Method of Borrowing.

(a) Borrower shall give notice (a "Notice of Borrowing") to the Lender by _____ [time] a.m./p.m. local time on the Domestic Business Day of each Loan to be made to Borrower, specifying (i) the date of such Loan, which shall be a Domestic Business Day; and (ii) the aggregate principal amount of such Loan.  At a very minimum, the Notice of Borrowing shall be acknowledged and endorsed in writing by the Court-approved CRO for the Borrower.

(b) A Notice of Borrowing shall not be revocable by Borrower.

(c) Not later than _____ [time] a.m./p.m. local time on the date of each Loan, the Lender shall make available the amount of such Loan to Borrower at the Lender's aforesaid address by crediting such funds to a demand deposit account of Borrower specified by Borrower (or such other account mutually agreed upon in writing between the Lender and Borrower).

(d) Borrower hereby irrevocably authorizes the Lender to rely on telephonic, telegraphic, telecopy, telex or written instructions of Borrower's Managers.

2.03 Interest Rates. So long as no Event of Default under this Agreement has occurred and is continuing, each Loan shall bear interest on the outstanding principal amount thereof, for each day from the date such Loan is made until it becomes due, at a rate per annum equal to twelve percent (12%).

2.04 Computation of Interest. Interest on Loans hereunder shall be computed on the basis of a year of 365 days and paid for the actual number of days elapsed (including the first day but excluding the last day).

2.05 Expenses. Borrower shall pay the reasonable expenses of the Lender, including, without limitation, the reasonable fees and disbursements of all legal, environmental or other consultants incurred in connection with the DIP loan.

2.06 Prepayments. Borrower may, upon notice to the Lender specifying that it is paying the Loans, pay without penalty or premium the Loans in whole at any time or in part from time to time, by paying the principal amount to be paid.

2.07 General Provisions as to Payments. Borrower shall make each payment of principal of, and interest on, the Loans and of fees and all other amounts payable by Borrower under this Agreement, not later than 5:00 p.m. local time on the date when due and payable, without condition or deduction for any counterclaim, defense, recoupment or setoff, in Federal or other funds immediately, to the Lender. All

payments received by the Lender after 5:00 p.m. local time shall be deemed to have been received by the Lender on the next succeeding Domestic Business Day. Whenever any payment of principal of, or interest on, the Loans or of fees shall be due on a day which is not a Domestic Business Day, the date for payment thereof shall be extended to the next succeeding Domestic Business Day. If the date for any payment of principal is extended by operation of law or otherwise, interest thereon, at the then applicable rate, shall be payable for such extended time.

## SECTION 3. PRECONDITIONS TO LOANS

3.01 Initial Loan. Notwithstanding any provision contained in this Agreement to the contrary, the Lender shall not have any obligation to make the initial Loan under this Agreement unless the Lender shall have first received:

(a) this Agreement and a Security Agreement, each executed by a duly authorized officer of Borrower;

(b) an order of the U.S. Bankruptcy Court for the Eastern District of Louisiana authorizing the loan.

3.02 All Loans. Notwithstanding any provision contained in this Agreement to the contrary, the Lender shall not have any obligation to make any Loan under this Agreement unless:

(a) the Lender shall have received a Notice of Borrowing, acknowledged and endorsed in writing by the Court-approved CRO, for such Loan as required by Section 2.02;

(b) both immediately before and immediately after giving effect to such Loan, no Default or Event of Default under this Agreement shall have occurred and be continuing;

(c) (intentionally left blank); and

(d) all of the representations and warranties made by Borrower in this Agreement and/or in any of the other Transaction Documents shall be true and correct in all material respects on and as of the date of such Loan as if made on and as of the date of such Loan.

Each request for a Loan by Borrower under this Agreement shall be deemed to be a representation and warranty by Borrower on the date of such Loan as to the facts specified in clauses (b), (c) and (d) of this Section 3.02.

## SECTION 4. REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to the Lender that:

4.01 Corporate Existence and Power. Borrower: (a) is duly incorporated, validly existing and in good standing under the laws of the State of Louisiana; (b) has all requisite corporate powers required to carry on its business as now conducted; (c) has all requisite governmental and regulatory licenses, authorizations, consents and approvals required to carry on its business as now conducted, except such licenses, authorizations, consents and approvals the failure to have could not reasonably be expected to

have a Material Adverse Effect; and (d) is qualified to transact business as a foreign corporation in, and is in good standing under the laws of, all states in which it is required by applicable law to maintain such qualification and good standing except for those states in which the failure to qualify or maintain good standing could not reasonably be expected to have a Material Adverse Effect.

4.02 Corporate Authorization. The execution, delivery and performance by Borrower of this Agreement and the other Transaction Documents are within the corporate powers of Borrower and have been duly authorized by all necessary corporate and other action on the part of Borrower.

4.03 Binding Effect. This Agreement, the Note and the other Transaction Documents have been duly executed and delivered by Borrower and constitute the legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency or other similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

## SECTION 5. EVENTS OF DEFAULT

If any of the following (each of the following herein sometimes called an "Event of Default") shall occur and be continuing:

5.01 Borrower shall fail to pay any of the Borrower's Obligations constituting principal due under the Loans as and when the same shall become due and payable;

5.02 Borrower shall fail to pay any of the Borrower's Obligations constituting expenses or other amounts (other than principal due under the Loans);

5.03 Any representation or warranty made by Borrower in this Agreement, in any other Transaction Document or in any certificate, agreement, instrument or written statement furnished or made or delivered pursuant hereto or thereto or in connection herewith or therewith, shall prove to have been untrue or incorrect in any material respect when made or effected;

5.04 Borrower shall fail to perform or observe any term, covenant or provision contained in this agreement;

5.05 There occurs any unisecured damage to or loss, theft, or destruction of any collateral given for the loan ;

5.06 This Agreement or any of the other Transaction Documents shall at any time for any reason (other than termination of this Agreement or such other Transaction Documents, as the case may be, in accordance with its terms) cease to be in full force and effect or shall be declared to be null and void by a court of competent jurisdiction, or if the validity or enforceability thereof shall be contested or denied by Borrower, or if the transactions completed hereunder or thereunder shall be contested by Borrower or if Borrower shall deny that it has any further liability or obligation hereunder or thereunder;

5.07 Any of the following:

(a) Debtor breaches or violates any term of the Interim Order, the Final Order, or any Order of the U.S. Bankruptcy Court for the Eastern District of Louisiana;

(b) Debtor uses Operations Advances for purposes not authorized by the Bankruptcy Code or the U.S. Bankruptcy Court for the Eastern District of Louisiana;

(c) (intentionally left blank);

(d) the creation, existence or allowance of any non-ordinary course Indebtedness, whether recourse or nonrecourse, and whether superior or junior, resulting from borrowings, loans, advances, or the granting of credit, whether secured or unsecured, except

    (i)  Indebtedness to Lender arising under or as a consequence of the DIP Loan Agreement or the other Loan Documents and

    (ii)  Indebtedness existing on the Petition Date or otherwise expressly permitted under the DIP Loan Agreement or the orders of the U.S. Bankruptcy Court for the Eastern District of Louisiana;

(e) the creation, existence or allowance of any Liens on any of Debtor's properties or assets except the Liens existing as of the Petition Date and the Liens created or permitted under the DIP Loan Agreement or the orders of the U.S. Bankruptcy Court for the Eastern District of Louisiana; or

(f) The occurrence of any of the following in the Case:

    (i)  the bringing of a motion, taking of any action or the filing of any plan or reorganization or disclosure statement attendant thereto by Debtor; to sell any assets of Debtor through a sale under Section 363 of the Bankruptcy Code; to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to the DIP Loan Agreement; to grant any Lien upon or affecting any Collateral; or any other action adverse to Lender or its rights and remedies hereunder or its interest in the Collateral;

    (ii)  the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Interim Order or the Final Order without the written consent of Lender, or the filing of a motion for reconsideration with respect to the Interim Order or the Final Order;

    (iii)  the Final Order is not entered immediately following the expiration of the Interim Order;

    (iv)  the payment of, or application for authority to pay, any prepetition claim without Lender's prior written consent or pursuant to an order of the Bankruptcy Court after notice and hearing unless otherwise permitted under the DIP Loan Agreement;

    (v)  (intentionally left blank);

(vi)  the appointment of an interim or permanent trustee in the Case or the appointment of an examiner in the Case; or the sale without Lender's consent, of all of Debtor's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Case, or otherwise that does not provide for payment in full of the Obligations and termination of Lender's commitment to make the Advances;

(vii)  the dismissal of the Case, or the conversion of the case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or the filing of a motion or other pleading by Debtor seeking the dismissal of the Case under Section 1112 of the Bankruptcy Code or otherwise;

(viii)  the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor to execute upon or enforce a Lien on any Collateral;

(ix)  the commencement of a suit or action against Lender and, as to any suit or action brought by any Person other than Debtor or a subsidiary, officer or employee of Debtor, the continuation thereof without dismissal for 30 days after service thereof on Lender, that asserts by or on behalf of Debtor, the Environmental Protection Agency, any state environmental protection or health and safety agency, or any official committee in the Case, any claim or legal or equitable remedy which seeks subordination of the claim or Lien of Lender.  Notwithstanding the foregoing, the filing of an adversary proceeding to determine the rank, validity and priority of pre-petition liens against bankruptcy estate property, including the pre-petition claim and mortgage held by Lender, shall not be an event of default; or

(x)  the entry of an order in the Case granting any other super-priority claim or Lien equal or superior to the claims and Liens granted to Lender;

THEN, and in each such event the Lender may declare that the obligations of the Lender to make Loans under this Agreement have terminated, whereupon such obligations of the Lender shall be immediately and forthwith terminated, and the Lender may further declare the entire outstanding principal balance of and all accrued and unpaid interest on the Note and all of the other Borrower's Obligations to be forthwith due and payable, whereupon all of the unpaid principal balance of and all accrued and unpaid interest on the Note and all of such other Borrower's Obligations shall become and be immediately due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by Borrower, and the Lender may exercise any and all other rights and remedies which they may have under any of the other Transaction Documents or under applicable law; provided, however, that upon the occurrence of any event described in Section 5, the obligation of the Lender to make Loans under this Agreement shall automatically terminate and the entire outstanding principal balance of and all accrued and unpaid interest on the Note and all of the other Borrower's Obligations shall automatically become immediately due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by Borrower, and the Lender may exercise any and all other rights and remedies which they may have under any of the other Transaction Documents or under applicable law.

## SECTION 6. GENERAL

6.01 No Waiver. No failure or delay by the Lender in exercising any right, remedy, power or privilege

under this Agreement or under any other Transaction Document shall operate as a waiver thereof; nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights and remedies provided in this Agreement and in the other Transaction Documents are cumulative and not exclusive of any remedies provided by law. Nothing herein contained shall in any way affect the right of the Lender to exercise any statutory or common law right of banker's lien or set-off.

6.02 Right of Set-Off. Upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, without notice to Borrower (any such notice being expressly waived by Borrower) and to the fullest extent permitted by law, to set-off and apply any and all deposits (general or special, time or demand, provisional or final, but specifically excluding any trust or segregated accounts) at any time held by the Lender and any and all other indebtedness at any time owing by the Lender to or for the credit or account of Borrower against any and all of the Borrower's Obligations irrespective of whether or not the Lender shall have made any demand under this Agreement or under any of the other Transaction Documents and although such obligations may be contingent or unmatured. The Lender agrees to promptly notify Borrower after any such set-off and application made by the Lender, provided, however, that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Lender under this Section 6 are in addition to any other rights and remedies (including, without limitation, other rights of set-off) which the Lender may have. Nothing contained in this Agreement or any other Transaction Document shall impair the right of the Lender to exercise any right of set-off or counterclaim it may have against Borrower and to apply the amount subject to such exercise to the payment of indebtedness of Borrower unrelated to this Agreement or the other Transaction Documents.

6.03 Cost and Expenses. Borrower agrees, whether or not any Loan is made under this Agreement, to pay or reimburse the Lender upon demand for (a) all out-of-pocket costs and expenses (including, without limitation, reasonable attorney's fees and expenses incurred by the Lender in connection with the preparation, documentation, negotiation and/or execution of this Agreement and/or any of the other Transaction Documents; (b) all recording, filing and search fees and expenses incurred by the Lender in connection with this Agreement and/or any of the other Transaction Documents; (c) all out-of-pocket costs and expenses (including, without limitation, reasonable attorney's fees and expenses) incurred by the Lender in connection with the (i) preparation, documentation, negotiation and execution of any amendment, modification, extension, renewal or restatement of this Agreement and/or any of the other Transaction Documents; or (ii) the preparation of any waiver or consent under this Agreement or under any of the other Transaction Documents; and (d) if an Event of Default occurs, all out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by the Lender in connection with such Event of Default and collection and other enforcement proceedings resulting therefrom. Borrower further agrees to pay or reimburse the Lender upon demand for any stamp or other similar taxes which may be payable with respect to the execution, delivery, recording and/or filing of this Agreement and/or any of the other Transaction Documents.

6.04 General Indemnity. In addition to the payment of expenses pursuant to Section 6, whether or not the transactions contemplated hereby shall be consummated, Borrower hereby agrees to defend, indemnify, pay and hold the Lender and any holders of the Note, and the officers, directors, employees, agents and affiliates of the Lender and such holder (collectively, the "Indemnitees") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits,

claims, disbursements, costs and expenses of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for such Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnitees shall be designated a party thereto), that may be imposed on, incurred by or asserted against the Indemnitees, in any manner relating to or arising out of this Agreement, any of the other Transaction Documents or any other agreement, document or instrument executed and delivered by Borrower in connection herewith or therewith, the statements contained in any commitment letters delivered by the Lender, the agreement of the Lender to make the Loans under this Agreement or the use or intended use of the proceeds of any Loan under this Agreement (collectively, the "indemnified liabilities"); provided that:

(a) Borrower shall have no obligation to an Indemnitee hereunder with respect to indemnified liabilities directly and solely resulting from the gross negligence or willful misconduct of that Indemnitee as determined by a court of competent jurisdiction in a final, non-appealable order; and

(b) Borrower shall have no obligation to indemnify the Lender with respect to disputes between the Lender or with respect to disputes among the Lender. To the extent that the undertaking to indemnify, pay and hold harmless set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all indemnified liabilities incurred by the Indemnitees or any of them. The provisions of the undertakings and indemnification set out in this Section 6 shall survive satisfaction and payment of the Borrower's Obligations and the termination of this Agreement.

6.05 Notices. Each notice, request, demand, consent, confirmation or other communication under this Agreement shall be in writing and delivered in person or sent by facsimile or registered or certified mail, return receipt requested and postage prepaid, to the applicable party at its address or facsimile number set forth on the signature pages hereof, or at such other address or facsimile number as any party hereto may designate as its address for communications hereunder by notice so given. Such notices shall be deemed effective on the day on which delivered or sent if delivered in person or sent by facsimile (with answerback confirmation received), or on the third (3rd) Domestic Business Day after the day on which mailed, if sent by registered or certified mail.

6.06 Governing Law. This Agreement shall be governed by and construed in accordance with the substantive laws of the State of Louisiana (without reference to conflict of law principles).

6.07 Amendments and Waivers. Any provision of this Agreement, the Note or any of the other Transaction Documents to which Borrower is a party may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by both parties hereto; provided however, that notwithstanding the foregoing (a) no such amendment shall increase the Revolving Credit Commitment unless such amendment is signed by the Lender; and (b) no such amendment or waiver shall, unless signed by the Lender:

(i) decrease the Revolving Credit Commitment;

(ii) extend the term of the Revolving Credit Period;

(iii) reduce the principal amount of or rate of interest on any Loan or any fees hereunder;

(iv) postpone the date fixed for any payment of principal of or interest on any Loan or any fees hereunder; or

(v) waive any Event of Default caused by the failure of Borrower to pay any principal of and/or interest on any Loan or any fees hereunder when due.

6.08 References; Headings for Convenience. Unless otherwise specified herein, all references herein to Section numbers refer to Section numbers of this Agreement. The Section headings are furnished for the convenience of the parties and are not to be considered in the construction or interpretation of this Agreement.

6.09 Severability. In the event any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

6.10 Counterparts. This Agreement may be executed in any number of counterparts (including facsimile counterparts), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Borrower and the Lender have executed this Loan Agreement as of the _____[number] day of _____[month], 20__.


BORROWER:                                          LENDER:


_____        _____
Signature of Authorized Borrower for American        Signature of Authorized Lender for Hillair
Natural Energy Corporation                           Capital Investments, LP


_____        _____
Print Name                                           Print Name


_____        _____
Date                                                 Date

**EXHIBIT 3**

# UNITED STATES BANKRUPTCY COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re:** | : | |
| | : | |
| **AMERICAN NATURAL ENERGY** | : | **NO. 15-12229** |
| **CORPORATION,** | : | |
| | : | **Chapter 11** |
| **Debtor.** | | |

## INTERIM ORDER

CONSIDERING the Motion for Interim and Final Orders (I) Authorizing Debtor to Obtain Post-Petition Secured Financing, (II) Granting Priming Liens and Super-Priority Claims to Post-Petition Lender, (III) Authorizing the Use of Cash Collateral and Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Approving Notice Procedures ("Motion") {Docket No filed by the debtor-in-possession, American Natural Energy Corporation ("ANEC"), the hearing held on October 7, 2015, and for the oral reasons assigned:

**IT IS ORDERED** that the Motion is granted, as modified below;

**IT IS FURTHER ORDERED** that ANEC is authorized to immediately finalize a revolving loan in the amount up to $1,000,000 from Hillair Capital Investments, LP ("Hillair"), with said loan to carry a 12% non-default interest rate;

**IT IS FURTHER ORDERED** that the loan made by Hillair shall be entitled to a super-priority, priming first position rank in accordance with section 364(d)(1) of the Bankruptcy Code with respect to ANEC's leasehold interests, including but not limited to all such interests in the Bayou Couba Field, St. Charles Parish, Louisiana, inventory, receivables and cash to the extent of advances outstanding up to $1,000,000. A copy of the property description is attached hereto

as Exhibit A.  The extent of the security interest reaches all assets of the Debtor except avoidance actions and the proceeds, if any, therefrom.   Accordingly, this super-priority lien shall subordinate the mortgage and security interest of Hillair, as assignee of TCA Global Credit Master Fund, LP, on substantially all of the assets of ANEC, as well as all potential lien claims and/or judicial mortgages, if any, in favor of: (1) Bayou Fuel Marine & Hardware Supplies, Inc., (2) Parker Drilling Offshore USA, LLC, (3) Frank's Casing Crew & Rental Tools, Inc., (4) C&M Contractors, Inc., (5) Central Boat Rentals, Inc., (6) Express Supply, LLC, (7) Altec, Inc., (8) Tripoint, LLC, (9) Basic Energy Services, LP, (10) Terrebonne Wireline Services, Inc., (11) Roustabouts, Inc., (12) Baker Hughes Oilfield Operations, Inc., (13) Petroleum Engineers, Inc., (14) B & B Oilfield Services, LLC, (15) Green Field Energy Services, Inc., (16) OBES, Inc., d/b/a Olebrook Directional Services, (17) Reamco, Inc., (18) Guichard Operating Company, LLC, (19) Cougar Oil Corp, (20) Platinum Pressure Pumping, Inc., and (21) Eaton Oil Tools, Inc.  Subject to a contemplated lien ranking adversary proceeding, each of the foregoing who ultimately are awarded a judgment recognizing an allowed secured or partially-secured claim shall receive post-petition replacement liens in accordance with that judgment and, in any event, a full reservation of all rights with respect to the final hearing on this Motion.  Nothing in this Order, however, should be construed as a judicial determination of rank, validity or extent of a security interest in estate property;

**IT IS FURTHER ORDERED** that Hillair shall be entitled to an administrative expense claim to the extent of the $1,000,000 loan actually advanced pursuant to section 364(c) of the Bankruptcy Code;

- 2 -

**IT IS FURTHER ORDERED** that the automatic stay is modified only insofar as necessary for ANEC to execute any and all loan documents and for Hillair to perfect the liens granted herein, including but not limited to the recordation of UCC financing statements;

**IT IS FURTHER ORDERED** that Hillair is a good faith lender with respect to the interim loan approved herein pursuant to section 364(e) of the Bankruptcy Code;

**IT IS FURTHER ORDERED** that ANEC is permitted to use cash collateral through the anticipated final hearing in accordance with the budget attached to the Motion as Exhibit 5.  Any amendment to the budget shall, at a minimum, provide for all payments contemplated to the United States Trustee;

**IT IS FURTHER ORDERED** that the remaining terms set out in paragraph 17 of the Motion, including but not limited to events of default, default rate of interest, fees and expenses of lender, stay relief (except as expressly permitted by this Order), professional carve-out and indemnification, are not effective during the interim period, and shall all be addressed at the final hearing;

**IT IS FURTHER ORDERED** that the final hearing on the Motion shall be held on **October __, 2015, at ____ _.m. Central Time** at the United States Bankruptcy Court for the Eastern District of Louisiana,  500 Poydras Street, Hale Boggs Federal Building, New Orleans, Louisiana; and

**IT IS FURTHER ORDERED** that counsel for ANEC shall serve this Order via email or by mail, to the U.S. Trustee, to counsel for Hillair, all parties identified above as holders of potential liens or judgments and upon the 20 largest unsecured creditors.

1166479.1
NO PHW 892105 v1
2900009-000020

1166479.1
NO PHW 892105 v1
2900009-000020

Date: _____, 2015.

Submitted by:

[Jan's info here]

APPROVED AS TO FORM:

    Michael A. Crawford, Bar #22315
    TAYLOR, PORTER, BROOKS & PHILLIPS L.L.P.
    450 Laurel Street, 8th Floor
    P.O. Box 2471
    Baton Rouge, LA 70801/70821
    Phone: (225) 387-3221
    Fax: (225) 346-8049
    Attorneys for Hillair Capital Investments, LP

1166479.1
NO PHW 892105 v1
2900009-000020

**EXHIBIT 4**

ALTEC INC
619 E SECOND ST
BROUSSARD, LA 7 0518

B7B OILFIELD SERVIES., LLC
P.O. BOX 207
BROUSSARD, LA  70518

BAKER HUGHES OILFIELD OPER,  INC
2929 ALLEN PARKWAY, SUITE 2100
HOUSTON, TX 77019

BASIC ENERGY SERVICES
801 CHERRY STREET, SUITE 2100
FORT WORTH, TX  76102

BAYOU FUEL MARINE & HARDWARE
PO BOX 70
LAFITTE, LA 70067

C & M CONTRACTORS INC
4932 KENAL RD
LAFITTE, LA 70067

CDM RESOURCE MANAGEMENT LTD
20405 TOMBALL PKWY, STE 700
HOUSTON, TX 77070

CENTRAL BOAT RENTALS INC
1640 RIVER RD
BERWICK, LA 70342

CONNER & WINTERS LLP
4000 ONE WILLIAMS CENTER
TULSA, OK 74172-0148

COUGAR OIL CORPORATION
52 7 BEAULLIEU DR
LAFAYETTE, LA 70508

DOUGLAS MACGREGOR
22 Cr 727
GUNNISON, CO 82130

EATON OIL TOOLS INC
P.O. BOX 1050
BROUSSARD, LA 70518-1050


EXXONMOBIL
PO Box 4707
HOUSTON, TX 77210-4707


FRANK'S CASING CREW & RENTAL TOOLS INC
PO BOX 51729
LAFAYETTE, LA 70505-1729


GOTHIC RESOURCES, INC.
C/O AMERICAN NATURAL ENERGY CORPORATION
2512 E. 71ST  ST, SUITE J
TULSA, OK 74136


GREEN FIELD ENERGY SERVICES
4 0 23 AMBASSADOR CAFFERY, SUITE 200
LAFAYETTE, LA 70503


GUICHARD OPER CO INC
PO BOX 2000
CROWLEY, LA


HILLAIR CAPITAL INVESTMENTS, L.P.
345 LORTON AVE, SUITE 303
BURLINGAME, CA 94010


INTERNAL REVENUE SERVICE
1645 S 101st E AVENUE
TULSA, OK 74128


LEEDE FINANCIAL MARKETS, INC.
SUITE 1800-1140 WEST PENDER STREET
VANCOUVER, BC V6E 4G1


LOUISIANA OIL PROPERTIES
270 PARK AVENUE, 9TH FLOOR
NEW YORK, NY 10017-2014


MICHAEL PAULK & STEVEN P. ENSZ
2512 E. 71st ST,  SUITE  J
TULSA, OK 74136

OLEBROOK DIRECTIONAL SERVICES
312 ERGASON RD
CLEBURNE, TX 76013


PALO VERDE ACQUISITIONS, LLC
7711 EAST 111TH STREET, SUITE 121
TULSA, OK 74133


PAR III, INC
7711 EAST 111TH STREET SOUTH, SUITE 121
TULSA, OK 74133


PARKER DRILLNG OFFSHORE USA, LLC
PO BOX 842043
DALLAS, TX 75284-2043


PETROLEUM ENGINEERS, INC.
500 DOVER BLVD, SUITE 310
LAFAYETTE, LA  70503


PLATINUM PRESSURE PUMPING
2100 W LOOP SOUTH, STE 1601
HOUSTON, TX 77027


REAMCO INCORPORATION
1149 SMEDE HWY
BROUSSARD, LA 7 0518


RICHARD MULFORD
3209 S HICKORY LN W
CHANDLER, OK 74834


RIGGS, ABNEY, NEAL, TURPEN, ORBISON & LE
502 W 6TH ST
TULSA, OK  74119-1010


ROUSTABOUTS INC
226 ROUSTABOUT ST
HOUMA, LA 7 03 63


SUMMA ENGINEERING INC
101 PARK AVE, STE 490
OKLAHOMA CITY, OK 73102-7211

ST. CHARLES PARISH  SHERIFF'S DEPARTMENT
P.O. BOX 426
HAHNVILLE, LA 70057


SECURITIES AND EXCHANGE COMMISSION
FORT WORTH REGIONAL OFFICE
BURNETT PLAZA
801 CHERRY STREET
SUITE 1900, UNIT 18
FORT WORTH, TX 76102

TCA GLOBAL MASTER FUND
19950 W COUNTRY CLUB DRIVE #101
AVENTURA, FL 33180

TERREBONNE WIRELINE SERVICES, INC.
155 PUGS COURT
HOUMA, LA 70363

TPC ENERGY LLC
PO BOX 130504
SPRING, TX 77393

TRIPOINT LLC
DEPT 381
PO BOX 4346
HOUSTON, TX 77210-4346

XPRESS SUPPLY LLC
1820 BELLE CHASSE HWY STE 107
GRETNA, LA 70056

**EXHIBIT 5**

**American Natural Energy Corporation**

Bankruptcy

| | | | | |
|---|---|---|---|---|
| Insolvency Petion Counsel | | | $ | 12,000 |
| DIP Lender Counsel | | | $ | 50,000 |
| Debtor Counsel | | | $ | 25,000 |
| Unsecured creditors committee counsel | | | $ | 20,000 |
| Management travel for hearings | | | $ | 10,000 |
| Chief Restructuring Officer | 2 months @ | 25,000 | $ | 50,000 |
| US Trustee | | | $ | 5,000 |

Working Capital

| | | | | | |
|---|---|---|---|---|---|
| Legal | | | | | |
| Focus Exploration | | 2 months @ | 10,000 | $ | 20,000 |
| Computershare | | | | $ | 1,300 |
| Collarini Associates | | | | | |
| Insurance - Liability and Workmens comp | | | | $ | 53,907 |
| Malone Bailey | | | | $ | 63,000 |
| Office rent, telephone | | 2 months @ | 3,500 | $ | 7,000 |
| Other office expense | | 2 months @ | 1,500 | $ | 3,000 |
| Office Payroll | | | | | |
| Priority Wages | Mike | | | $ | 12,475 |
| | Steve | | | $ | 12,475 |
| | Dick | | | $ | 12,475 |
| | Janna | | | $ | 12,475 |
| | Bob | | | $ | 12,475 |
| Salaries | Mike | 2 months @ | 15,000 | $ | 30,000 |
| | Steve | 2 months @ | 15,000 | $ | 30,000 |
| | Dick | 2 months @ | 9,000 | $ | 18,000 |
| | Janna | 2 months @ | 4,500 | $ | 9,000 |
| | Bob | 2 months @ | 2,500 | $ | 5,000 |
| Taxes and Insurance | | 20% of salaries above | | $ | 30,875 |
| Field payroll | | | | | |
| Priority Wages | John | | | $ | 12,000 |
| | Roy | | | $ | 8,000 |
| Salaries and dayrate | John | 2 months @ | 6,000 | $ | 12,000 |
| | Roy | 2 months @ | 4,000 | $ | 8,000 |
| | New emp. #1 | 2 months @ | 2,250 | $ | 4,500 |
| | New emp. #2 | 2 months @ | 2,250 | $ | 4,500 |
| | New emp. #3 | 2 months @ | 2,250 | $ | 4,500 |
| | New emp. #4 | 2 months @ | 2,250 | $ | 4,500 |

**SYSTEM RESTART**

**Upgrades to vessel containment systems**

| | | | |
|---|---|---|---|
| Environmental engineer | | $ | 10,000 |
| Repairs and improvements | | $ | 150,000 |

**Compression system prepay and maintenance payments**

| | |
|---|---|
| $ | 60,000 |

**Gas lift system gas purchase prepay**

| | |
|---|---|
| $ | - |

**Well and disposal well maintenance**

| | | | | | |
|---|---|---|---|---|---|
| 109 | Pull & Repair GL Valve | 2 day | | 7,000 | $ 142,500 |
| 110 | Cut Paraffin | 3 days | | 10,500 | |
| 118 | Cut Paraffin | 3 day | | 10,500 | |
| 51 | Pull & Repair GL Valve | 2 day | | 7,000 | |
| 109 | Repair Flowline | 1 day | | 3,500 | |
| 51 | Repair Gaslift Line | 1 day | | 3,500 | |
| 85 | Acidize Disposal | 1 day | | 13,500 | |
| | Travel for Unit | 2 days | | 7,000 | |
| Other Well equipment | | | | 10,000 | |
| Supervisory expense and travel | | | | 5,000 | |
| Field operating expenses | | | 2 months | 65,000 | |

| | |
|---|---|
| $ | 925,957 |