## UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF LOUISIANA

In re:                                            :
                                                  :
AMERICAN NATURAL ENERGY                           :  NO. 15-12229
CORPORATION,                                      :
                                                  :  Chapter 11
    Debtor.                                       :
                                                     SECTION "A"

**FINAL ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION
SECURED FINANCING, (II) GRANTING PRIMING LIENS AND SUPER-PRIORITY
CLAIMS TO POST-PETITION LENDER, (III) AUTHORIZING THE USE OF CASH
COLLATERAL AND GRANTING ADEQUATE PROTECTION, (IV) MODIFYING
THE AUTOMATIC STAY, AND (V) APPROVING NOTICE PROCEDURES**

CONSIDERING the Motion for Interim and Final Orders (I) Authorizing Debtor to

Obtain Post-Petition Secured Financing, (II) Granting Priming Liens and Super-Priority Claims

to Post-Petition Lender, (III) Authorizing the Use of Cash Collateral and Granting Adequate

Protection, (IV) Modifying the Automatic Stay, and (V) Approving Notice Procedures

("Motion") {Docket No. 22} filed by the debtor-in-possession, American Natural Energy

Corporation ("Debtor"), the hearing held on October 23, 2015, and for the oral reasons assigned:

A hearing to consider the relief requested in the Motion on an interim basis was

held on October 7, 2015 and an Interim Order approving the post-petition financing

having been entered by this Court on October 13, 2015 {Docket No. 37} scheduling the

final hearing on the post-petition financing for October 23, 2015 (the "Final Hearing").

Proper notice of the Final Hearing having been served and based upon the record made

by the Debtor at the Final Hearing, and the lack of opposition to the Motion, the Court

1

is of the opinion that the Motion should be granted and that this Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable as of the Petition Date.

Having examined the Motion, being fully advised of the relevant facts and circumstances surrounding the Motion, and having conducted the Final Hearing pursuant to section 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c), and further noting the lack of objections, THE MOTION IS GRANTED AND THE COURT HEREBY FINDS THAT:

A.     On the Petition Date, Hillair Capital Investments, L.P. ("DIP Lender") and other creditors filed an involuntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor has voluntarily converted the involuntary to a voluntary chapter 11 proceeding and has retained possession of its property and continues to operate its businesses as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.     The Court has jurisdiction over the Chapter 11 Case and this proceeding pursuant to 28 U.S.C. § 1334. Determination of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue over this Motion is proper under 28 U.S.C. § 1409(a).

C.     A Committee has not yet been appointed in the Chapter 11 Case.

D.     The Debtor admits, stipulates, and agrees that:

1.     Debtor needs to incur the post-petition financing as provided herein in order to prevent immediate and irreparable harm to its bankruptcy estate and minimize disruption to and avoid the termination of its business operations. Without immediate authority to obtain financing on the terms and conditions set forth in the DIP Loan Documents, the Debtor will be unable to meet its post-

2

petition obligations.  Entry of this Order will also enhance the possibility of maximizing the value of Debtor's assets.

2.      Debtor is unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code sufficient to finance the operations of its business.  Except as provided below, Debtor is unable to obtain credit allowable under sections 364(c)(1), (c)(2) or (c)(3) of the Bankruptcy Code on terms more favorable than those offered by DIP Lender.  The Debtor has immediate need for financing pursuant to the DIP Loan Documents.

3.      The terms of the post-petition financing have been negotiated at arm's length, and the post-petition financing is being extended in good faith, as that term is used in section 364(e) of the Bankruptcy Code.

4.      The terms and conditions of the DIP Loan Documents are fair and reasonable, the best available to Debtor under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and consideration.

5.      Under the circumstances of the Chapter 11 Case, this Order is a fair and reasonable response to Debtor's request for the DIP Lender's provision of post-petition financing, and the entry of this Order is in the best interest of Debtor's bankruptcy estate and its creditors.

6.      The notice provided by Debtor of the Motion, the hearing on the Motion, and the entry of this Order satisfy the requirements of Bankruptcy Rules 2002, 4001(b) and (c) and 9014, sections 102(1), 363, 364(c) and (d) of the

Bankruptcy Code and was otherwise sufficient and appropriate under the circumstances.

**AND THE COURT HEREBY ORDERS THAT:**

1.      Budget.  The Budget attached hereto as Exhibit 1 is approved.

2.      Authorization To Incur Post-petition Financing.

(a)      DIP Loan Documents.  The Debtor is hereby authorized and has agreed to: (1) execute the DIP Loan Agreement and Term Sheet (collectively, the "DIP Loan Documents"), including all documents that DIP Lender reasonably requests to implement the transactions contemplated by the DIP Loan Documents; and (2) perform its obligations under and comply with all of the terms and provisions of the DIP Loan Documents and this Order. Upon execution and delivery thereof, the DIP Loan Documents shall constitute valid and binding obligations of Debtor enforceable in accordance with their terms, however, to the extent there exists any conflict among the terms of the Motion, the DIP Loan Documents, and this Order, this Order shall govern and control.  The DIP Loan Documents are attached hereto as Exhibit 2.

(b)      Permitted Uses of Post-petition Financing.  Debtor is authorized and has agreed to incur post-petition financing solely:  (1) in accordance with the terms and provisions of this Order, (2) to pay the expenses enumerated in the Budget, to the extent required as and when such expenses become due and payable, and (3) to pay any post-petition charges.  If DIP Lender advances monies to Debtor and Debtor uses such monies other than in accordance with the terms or provisions of this Order, such advances shall be considered post-petition financing for purposes of this Order.

(c)      Certain Material Terms of Post-petition Financing.

4

(1)     Maximum Amount.     The maximum principal amount of post-petition financing outstanding shall not at any time exceed $1,000,000.

(2)     Interest.     The post-petition financing shall bear interest at a per annum rate equal to equal to twelve percent (12%).

(3)     Maturity.     The post-petition financing shall mature and be due and payable in full by Debtor in nine months, or on July 2, 2016.

(d)     Super-priority Administrative Expense Status.     DIP Lender shall be entitled to a super-priority, priming first position rank in accordance with section 364(d)(1) of the Bankruptcy Code with respect to Debtor's leasehold interests, including but not limited to all such interests in the Bayou Couba Field, St. Charles Parish, Louisiana, inventory, receivables and cash to the extent of advances outstanding up to $1,000,000 plus contractual interest and fees. The extent of the security interest reaches all assets of the Debtor except avoidance actions and the proceeds, if any, therefrom. Accordingly, this super-priority lien shall subordinate the mortgage and security interest of DIP Lender, as assignee of TCA Global Credit Master Fund, LP, on substantially all of the assets of Debtor, as well as all potential lien claims and/or judicial mortgages, if any, in favor of: (1) Bayou Fuel Marine & Hardware Supplies, Inc., (2) Parker Drilling Offshore USA, LLC, (3) Frank's Casing Crew & Rental Tools, Inc., (4) C&M Contractors, Inc., (5) Central Boat Rentals, Inc., (6) Express Supply, LLC, (7) Altec, Inc., (8) Tripoint, LLC, (9) Basic Energy Services, LP, (10) Terrebonne Wireline Services, Inc., (11) Roustabouts, Inc., (12) Baker Hughes Oilfield Operations, Inc., (13) Petroleum Engineers, Inc.,

5

(14) B & B Oilfield Services, LLC, (15) Green Field Energy Services, Inc., (16) OBES, Inc.,

d/b/a Olebrook Directional Services, (17) Reamco, Inc., (18) Guichard Operating Company,

LLC, (19) Cougar Oil Corp, (20) Platinum Pressure Pumping, Inc., and (21) Eaton Oil Tools,

Inc. Subject to a contemplated lien ranking adversary proceeding, each of the foregoing who

ultimately are awarded a judgment recognizing an allowed secured or partially-secured claim

shall receive post-petition replacement liens in accordance with that judgment. Nothing in this

Order, however, should be construed as a judicial determination of rank, validity or extent of a

security interest in estate property.

   3. <u>Additional DIP Loan Terms</u>.  The remaining terms set out in paragraph 17

of the Motion, including but not limited to events of default, default rate of interest, fees and

expenses of lender, stay relief, professional carve-out and indemnification, are hereby approved

and authorized, except as amended herein.

   4. <u>Amendments</u>.  Debtor and DIP Lender may enter into amendments or

modifications of the DIP Loan Documents or the Budget upon notice and a hearing, provided

however that such notice for purposes of an amendment to the DIP Loan Documents or Budget

may be provided by negative notice.

   5. <u>Interim Supplemental Loan</u>.   Any funds loaned to Debtor by DIP Lender

under the Supplemental Loan, as that term is defined in the Court's Interim Order {Docket No.

37}, shall fall under the terms, conditions, and benefits of the DIP Loan.  To avoid doubt, any

previously-advanced funds made by DIP Lender on an unsecured administrative priority basis in

reliance upon the Interim Order are retroactively granted super-priority status by this Order.

   6. <u>Binding Effect</u>.  Except as otherwise provided herein, this Order shall be

binding on all parties in interest in the Chapter 11 Case and their respective successors and

assigns, including any Trustee, except that any Trustee shall have the right to terminate this Order after notice and a hearing.  If, in accordance with section 364(e) of the Bankruptcy Code, this Order does not become a final non-appealable order, if a Trustee terminates this Order, or if any of the provisions of the Order are hereafter modified, amended, vacated or stayed by subsequent order of this Court or any other court, such termination or subsequent order shall not affect: (a) subject to the other provisions of this Order, the stipulations, representations, and findings contained in this Order and the relief granted by and the releases contained in this Order (including, without limitation, the paragraphs of this order respecting the priority, validity, enforceability or effectiveness of any lien, security interest or other benefit or claim authorized hereby with respect to post-petition financing incurred prior to the effective date of such termination or subsequent order).  All such liens, security interests, claims and other benefits shall be governed in all respects by the original provisions of this Order, and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted hereto, including the liens and priorities granted herein, with respect to the post-petition financing.  Except as otherwise explicitly set forth in this Order, no third party is intended to be, or shall be deemed to be, a third party beneficiary of this Order.

    7. <u>Survival</u>.  The provisions of this Order, and any actions taken pursuant to or in reliance upon the terms hereof, shall survive entry of, and govern in the event of any conflict with, any order which may be entered in the Case: (a) confirming any chapter 11 plan, (b) converting the Chapter 11 Case to a case under chapter 7 of the Code, (c) dismissing the Chapter 11 Case, (d) withdrawing of the reference of the Chapter 11 Case from this Court, or (e) providing for abstention from handling or retaining of jurisdiction of the Case in this Court.  The terms and provisions of this Order, including, without limitation, the rights granted the DIP

Lender under sections 364(c) and (d) of the Bankruptcy Code, shall continue in full force and effect until all of the post-petition financing is indefeasibly paid in full in cash and discharged.

      8.      <u>Continuing Jurisdiction</u>. The Court shall retain jurisdiction with respect to all matters arising from and related to the implementation, interpretation, and enforcement of this Order.

      **IT IS FURTHER ORDERED** that counsel shall serve this order on the required parties who will not receive notice through the ECF system pursuant to the FRBP and the LBRs and file a certificate of service to that effect within three (3) days.

      New Orleans, Louisiana, October 28, 2015.

                        Hon. Elizabeth W. Magner
                        U.S. Bankruptcy Judge

**American Natural Energy Corporation**

Bankruptcy

| | | | | |
|---|---|---|---|---|
| Insolvency Petion Counsel | | | $ | 12,000 |
| Debtor Counsel | | | $ | 25,000 |
| Unsecured creditors committee counsel | | | $ | 20,000 |
| Management travel for hearings | | | $ | 10,000 |
| Chief Restructuring Officer | 2 months @ | 25,000 | $ | 50,000 |
| US Trustee | | | $ | 5,000 |

Working Capital

| | | | | | |
|---|---|---|---|---|---|
| Legal | | | | | |
| Focus Exploration | | 2 months @ | 10,000 | $ | 20,000 |
| Computershare | | | | $ | 1,300 |
| Collarini Associates | | | | | |
| Insurance - Liability and Workmens comp | | | | $ | 53,907 |
| Malone Bailey | | | | $ | 63,000 |
| Office rent, telephone | | 2 months @ | 3,500 | $ | 7,000 |
| Other office expense | | 2 months @ | 1,500 | $ | 3,000 |
| Office Payroll | | | | | |
| Priority Wages | Mike | | | $ | 12,475 |
| | Steve | | | $ | 12,475 |
| | Dick | | | $ | 12,475 |
| | Janna | | | $ | 12,475 |
| | Bob | | | $ | 12,475 |
| Salaries | Mike | 2 months @ | 15,000 | $ | 30,000 |
| | Steve | 2 months @ | 15,000 | $ | 30,000 |
| | Dick | 2 months @ | 9,000 | $ | 18,000 |
| | Janna | 2 months @ | 4,500 | $ | 9,000 |
| | Bob | 2 months @ | 2,500 | $ | 5,000 |
| Taxes and Insurance | | 20% of salaries above | | $ | 30,875 |
| Field payroll | | | | | |
| Priority Wages | John | | | $ | 12,000 |
| | Roy | | | $ | 8,000 |
| Salaries and dayrate | John | 2 months @ | 6,000 | $ | 12,000 |
| | Roy | 2 months @ | 4,000 | $ | 8,000 |
| | New emp. #1 | 2 months @ | 2,250 | $ | 4,500 |
| | New emp. #2 | 2 months @ | 2,250 | $ | 4,500 |
| | New emp. #3 | 2 months @ | 2,250 | $ | 4,500 |
| | New emp. #4 | 2 months @ | 2,250 | $ | 4,500 |

**SYSTEM RESTART**

**Upgrades to vessel containment systems**

| | | |
|---|---|---|
| Environmental engineer | $ | 10,000 |
| Repairs and improvements | $ | 150,000 |

**Compression system prepay and maintenance**
   **payments**                                                $    60,000

**Gas lift system gas purchase prepay**             $    -

**Well and disposal well maintenance**

| | | | | |
|---|---|---|---|---|
| 109 Pull & Repair GL Valve | 2 day | | 7,000 | $ 142,500 |
| 110 Cut Paraffin | 3 days | | 10,500 | |
| 118 Cut Paraffin | 3 day | | 10,500 | |
| 51 Pull & Repair GL Valve | 2 day | | 7,000 | |
| 109 Repair Flowline | 1 day | | 3,500 | |
| 51 Repair Gaslift Line | 1 day | | 3,500 | |
| 85 Acidize Disposal | 1 day | | 13,500 | |
| Travel for Unit | 2 days | | 7,000 | |
| Other Well equipment | | | 10,000 | |
| Supervisory expense and travel | | | 5,000 | |
| Field operating expenses | | 2 months | 65,000 | |

                                                            $    875,957

SUPER-PRIORITY DEBTOR IN POSSESSION CREDIT FACILITY

Term Sheet
October __, 2015

This Term Sheet is delivered from Hillair Capital Investments L.P. ("Lender") to American Natural Energy Corporation, an Oklahoma corporation (the "Borrower") for a Super-Priority Debtor in Possession Credit Facility (the "Facility"), as evidenced by that certain Revolving Loan Agreement.

It is understood and agreed that Lender's interest in making the advances contemplated under the Facility is predicated upon the terms relating to a plan of reorganization or liquidation (a "Plan") under chapter 11 of the Bankruptcy Code, 11 U.S.C. § § 101, *et seq.* (the "Bankruptcy Code"), or the sale of substantially all of Borrower's assets pursuant to section 363 of the Bankruptcy Code (a "363 Sale").

From the date of execution of this Term Sheet until entry of the DIP Order (defined below) by the Bankruptcy Court, the Borrower, and its directors, employees, advisors, and other representatives and agents shall not solicit interest from, and shall discontinue all discussions and other communications with, potential financing sources or other parties regarding financing or other strategic transactions and will not respond to unsolicited proposals from such parties.

This Summary of Terms and Conditions ("Summary of Terms") is intended as an outline of certain of the material terms of the Facility and does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions which would be contained in definitive documentation for the Facility contemplated hereby.

---

| I. | **Parties** | |
|----|----|----|
| | Borrower(s): | American Natural Energy Corporation, an Oklahoma corporation |
| | Guarantors: | N/A |
| | DIP Lender: | Hillair Capital Investments L.P. |
| | Pre-Petition Lender: | Hillair Capital Investments L.P. |
| | Other Potential Secured Creditors: | Multiple Lien/Judgment Filings (See Exhibit A hereto) |
| II. | **Proposed Facility** | A maximum $1,000,000 term loan facility (the "Term Loan Facility" and the loans thereunder, the "Term Loan"). |
| | Term Loan Availability: | The Term Loan shall be made available in draws pursuant to written requests acknowledged and consented to in writing by the Chief Restructuring Officer (CRO) (as defined below) (the "Advances"). |
| | Purpose: | The proceeds of the Term Loan will be used (a) to finance the Debtor's estimated oil and gas workover efforts designed to restore production in the early phases of the bankruptcy, all in accordance |

with the DIP Budget (as defined below), and subject to the approval of the CRO, subject further to the expenditure variances referenced below under the heading "Affirmative Covenants" and (b) to pay the fees, costs and expenses incurred by the Debtors in connection with their chapter 11 bankruptcy cases, which will be converted on or about October 2, 2015 from an involuntary petition to a voluntary chapter 11 proceeding in the United States Bankruptcy Court for the Eastern District of Louisiana (the "Bankruptcy Court").    The bankruptcy case bears docket number 15-12229.

**III.    Certain Payment Provisions**

| | |
|---|---|
| Fees and Interest Rates: | As set forth on Annex I. |
| Mandatory Prepayments: | In addition to any scheduled installments due on the loans under the Facility, the Revolving Loan Agreement will contain a standard mandatory prepayment provision which will include a prepayment of amounts outstanding under the Facility upon a 363 Sale or transfer of assets of the Borrower or any of its subsidiaries, or confirmation of a Plan, at the option of the Lender. |
| Credit Bid: | The Revolving Loan Agreement will contain provisions allowing Lender to credit bid any amounts outstanding under the Facility, as well as amounts due Lender on a pre-petition basis, against the purchase price for the Debtors' assets in a 363 Sale. |

**IV.    Collateral and Other Credit Support**

Collateral:    The Facility will be secured by a senior secured lien and security interest in all of the assets of the Borrower, whether consisting of real, personal, tangible or intangible property (collectively, the "DIP Liens"), other than avoidance actions under sections 544, 547, or 548 of the Bankruptcy Code (collectively, the "Collateral").

Pursuant to section 364(c)(2) of the Bankruptcy Code, the Lender will be granted and shall have a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon any and all Collateral that is not subject to valid, perfected, non-avoidable and enforceable liens in existence as of the Petition Date or valid liens in existence as of the Petition Date that are perfected subsequent to such date to the extent permitted by section 546(b) of the Bankruptcy Code.

Pursuant to section 364(d)(1) of the Bankruptcy Code, the Lender will be granted and shall have a valid, binding, continuing, enforceable, fully-perfected first priority, priming senior security interest in and lien upon all Collateral that is subject to pre-petition liens securing the pre-petition obligations and all other security interests and liens on the Collateral (other than the liens of the Lender), except with respect to any valid, perfected and unavoidable interests in such property arising out of liens to which the holders of pre-petition liens become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

The DIP Liens granted to the Lender shall be senior to and shall not be subject or subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (b) subject to applicable law, any liens arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors other than as expressly permitted under the Facility. The DIP Liens are subject only to the Carve-Out (defined below).

The Lender will be granted an allowed super-priority administrative claim (the "DIP Lender Super-priority Claims") in accordance with section 364(c)(1) of the Bankruptcy Code, having a priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors (including, but not limited to, the pre-petition obligations, which for avoidance of doubt are not entitled to treatment as an ordinary or super-priority administrative claim except to the extent of any Adequate Protection Claim, as defined below, for diminution in value or as adequate protection for priming by the Facility), now in existence or hereafter incurred by the Debtors and over any and all administrative expenses or priority claims of any kind including as specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b) (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code, whether arising in the Debtor's chapter 11 cases or in any superseding chapter 7 case concerning the Debtors. The DIP Lender Super-priority Claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof, except so-called avoidance action proceeds.

Lender's DIP Liens and claims under the Facility shall be subject to a "Carve-Out" for (a) the allowed fees and expenses of the Debtor, a one-time payment to the involuntary petitioning creditors for expenses, including attorneys' fees, associated with involuntary filing, and any Official Committee of Unsecured Creditors' retained professionals in the Debtor's bankruptcy case in an amount acceptable to Lender, and (b) the fees required to be paid to the Clerk of Court and U.S. Trustee pursuant to 28 U.S.C. § 1930, provided that, in no event shall the total carve-out exceed $125,000. To avoid doubt, the retainer paid to the proposed counsel for the Debtor prior to the conversion of the case to a voluntary chapter 11 is not included in the Carve-Out limit of $125,000.

Adequate Protection to
Pre-Petition Lender:

The Pre-Petition Lender will be granted a replacement lien (the "Replacement Liens") subject to (a) unavoidable, duly perfected liens existing as of the Petition Date. The Replacement Lien granted to the Pre-Petition Lender will be: (a) prior and senior to all liens and encumbrances (other than fees arising under 28. U.S.C. §1930) of all other secured creditors in and to such property granted, or arising, subsequent to the date of the Interim Order; (b) any security interest or lien that is avoided or otherwise preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code; and (c) junior and subordinate to the Carve-Out and the DIP Liens granted to the Lender, to which the Replacement liens shall be immediately junior and subordinate.

The claims of the Pre-Petition Lender for any diminution in the value of its interests in the pre-petition Collateral of the Debtors (the "Pre-Petition Collateral") from the Petition Date resulting from (a) the use, sale, lease, disposition, shrinkage, decline in market value, consumption or physical deterioration of the Pre-Petition Collateral by the Debtors, and (b) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code shall constitute allowed claims against the Debtors with priority over all administrative expenses (other than any fees arising under 28 U.S.C. § 1930), diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (collectively, the "Pre-Petition Lender Super-priority Claims"), whether or not such expenses or claims may become secured by judgment lien or other non-consensual lien, levy, or attachment or otherwise, which allowed Pre-Petition Lender Super-priority Claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof; provided, however, that the Pre-Petition Lender Super-priority Claims granted to Pre-Petition Lenders shall be junior and subordinate to the Carve-Out and the DIP Lender Super-priority Claims.

The Pre-Petition Lender may reserve its rights to seek additional adequate protection; provided that any adequate protection provided shall be junior and subordinate to the DIP Liens, the Carve-Out and DIP Lender Super-priority Claims; and

Subject to and in accordance with the DIP Budget, the Pre-Petition Lender shall receive payment of interest on the Pre-Petition Obligations in accordance with the pre-petition loan documents.

**Adequate Protection to Other**

Secured Creditors:    **The Debtor anticipates filing an adversary proceeding in the Bankruptcy Case to determine the validity, extent and priority of certain liens and judgments. Those interests will receive replacement liens depending on the ultimate determination by the Bankruptcy Court in that proceeding.**

## V.    Certain Conditions

Advance Conditions:    The availability of the Facility shall be conditioned upon satisfaction of, among other things, the following conditions precedent (the date upon which all such conditions precedent shall be satisfied, the "Closing Date") on or before November 15, 2015:

(a)    The Borrower shall have executed and delivered satisfactory definitive financing documentation with respect to the Facility, including a revolving loan agreement (the "Revolving Loan Agreement"), security documents and other legal documentation (collectively, together with the Credit Agreement, the "Loan Documents") satisfactory to the Lender.

(b)    All governmental and third party approvals necessary in connection with the financing contemplated hereby and the continuing operations of the Borrower and its wholly-owned subsidiaries (including shareholder approvals, if any) shall have been obtained on satisfactory terms and shall be in full force and effect.

(c)    Lender shall have received (at the Borrower's expense) and be satisfied with the Borrower's unaudited financial statements for the most recently completed fiscal periods and the Borrower's most recent 13-week cash flow budget.

(d)    The Lender shall have received such closing documents as are customary for transactions of this type or as it may reasonably request, all in form and substance reasonably acceptable to the Lender and its counsel.

(e)    The corporate structure, capital structure, other debt instruments, material accounts, and governing documents of the Borrower and its wholly-owned affiliates, shall be acceptable to the Lender at the time of closing.

(f)    Entry of a Final Order by the Bankruptcy Court approving the Facility, on terms and conditions consistent with this Term Sheet and acceptable to Lender in its sole discretion, including customary waivers and protections (the "DIP Order"). Pending the final hearing and entry of the DIP Order, the Debtors will enter into, and implement on an interim basis, the Facility and Loan Documents in accordance with an Interim Order. All DIP Liens and Replacement Liens granted for the benefit of the Lender and the Pre-Petition Lenders shall be valid enforceable and deemed perfected, effective

upon the entry of the Interim Order, and no further action shall be required to effect such perfection.

## VI.   Certain Documentation Matters

The Loan Documents shall contain representations, warranties, covenants and events of default customary for financings of this type and other terms deemed appropriate by the Lender, including, without limitation:

Representations and Warranties:

Financial statements; no material adverse change; existence and standing, authorization and validity; compliance with law; corporate power and authority; enforceability of Loan Documents; no conflict with law; no default; ownership of property; intellectual property; taxes; insurance; ERISA; and accuracy of disclosure.

Affirmative Covenants:

Payment of obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws; maintenance of property and insurance; maintenance of books and records; right of the Lender to reasonable inspection of property and books and records; notices of defaults, litigation and other material events; compliance with environmental laws; depository banks, casualty and condemnation; and use of proceeds.

Negative Covenants:

Limitations (subject to exceptions, as appropriate, to be negotiated) on: indebtedness; liens; consolidations, liquidations and dissolutions; payment of restricted payments (including dividends and other payments in respect of capital stock); investments (including acquisitions), loans and advances; transaction with affiliates; changes in fiscal year; negative pledge clauses; and amendment of material documents; provided, however, the Loan Documents shall permit sales of assets in the ordinary course of business and other rights and entitlements set forth in this Term Sheet.

DIP Budget:

Borrower will comply with the terms of a debtor in possession budget incorporated into the Facility and approved by the Bankruptcy Court, subject to variances to be negotiated by the parties. Expenditures will be approved by the CRO.

Events of Default:

Nonpayment, inaccuracy of representations and warranties; violation of covenants; cross-default; certain ERISA events; noncompliance with term relating to the DIP Budget; or if:

(a) the Debtor's case is either dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(b) a trustee or an examiner with expanded powers is appointed in the chapter 11 case;

(c) any plan(s) of reorganization of the Debtor is filed which does not provide for the payment in full in cash of the post-petition DIP Term Loan obligations upon the effective date of the plan(s);

(d) the Debtor ceases operation of its business or takes any material action for the purpose of effecting such cessation without the prior written consent of the Lender;

(e) the Interim Order is reversed, vacated, stayed, amended, supplemented or otherwise modified in a manner which shall materially adversely affect the rights of the Lender or materially and adversely affects the priority of any or all of the Lender's claims, liens or security interests and which is not acceptable to the Lender, in its discretion;

(f) the DIP Order is not entered on or before thirty (30) days after the date of entry of the Order of Relief;

(g) the Debtor fails to comply with or perform, in any material respect, the terms and provisions of the Interim Order or any DIP Loan Document, including, without limitation, using the Term Loan or cash collateral other than in accordance with the provisions of the Interim Order and the DIP Order;

(h) any sale or other disposition of Collateral or cash collateral is approved without the consent of the Lender;

(i) any super-priority claim or lien equal or superior in priority to that granted to the Lender is granted;

(j) the automatic stay of Bankruptcy Code section 362 is lifted so as to allow a party other than the Lender to proceed against any material asset of any Debtor;

(k) the Debtor filed, or the Court enters an order confirming, a plan of reorganization, which plan is not in form and substance acceptable to the Lender; or

(l) any section 363 Sale milestones are not met within the period specified therefor, as the same may be extended in the sole discretion of the Lender.

Upon an uncured event of default, Lender may immediately seek relief from the automatic stay to exercise its rights and remedies pursuant to the DIP Loan Documents, the pre-petition loan documents and/or applicable law, including, without limitation, to foreclose on all or any portion of the Collateral, collect accounts receivable and other monies owing to the Debtors and apply the proceeds thereof in satisfaction of the Post-Petition Obligations and the Pre-Petition Obligations.

| | |
|---|---|
| Plan and/or 363 Sale: | Borrower will (i) file a plan of reorganization/liquidation within 120 days of the date of the order for relief for its chapter 11 case, or (ii) will obtain Bankruptcy Court approval to commence an auction and |

|  |  |
|---|---|
|  | sale process, culminating in a 363 Sale by no later than 150 days after the date that it commences its voluntary chapter 11 case; provided, however, notwithstanding the foregoing 150-day deadline with respect to the 363 Sale closing, and the 120-day deadline with respect to the Plan milestone, Borrower's time for completing a Plan or 363 Sale process shall be subject to demonstrating to Lender's reasonable satisfaction through its DIP Budget (as amended) the ability to fund such processes within the contemplated timeframes. Terms relating to the Plan milestone and the 363 Sale closing will be incorporated into the DIP Order. |
| Expenses: | The Borrower shall reimburse Lender for all actual and reasonable out-of-pocket expenses, including, without limitation, Lender's attorneys' fees and expenses, in connection with the Facility. |
| Governing Law: | The Loan Documents will be governed by the internal laws of the State of Louisiana. |

If you agree to the terms and conditions set forth in this Term Sheet, please sign and return one copy to the Lender.

**LENDER:**

**HILLAIR CAPITAL INVESTMENTS L.P.**

By:_____
Name: _____
Its:_____

**Accepted and Agreed to this __ day of September, 2015**

**BORROWER;**

**AMERICAN NATURAL ENERGY CORPORATION**

By:_____
Name: _____
Its:_____

Annex I

Interest and Certain Fees

| | |
|---|---|
| Interest Rate: | 12% |
| Interest Payment Dates: | Interest shall accrue and be due and payable on the earlier of the date of termination of the Facility or the Maturity Date. |
| Closing Fee: | A closing fee equal to $50,000.00 payable to Hillair Capital Management, LLC on the Closing Date, which shall be netted from the loan proceeds advanced. |
| Collateral Monitoring Fee: | An annual collateral monitoring fee equal to $10,000.00 payable in quarterly installments to Hillair Capital Management, LLC, with the first quarterly payment made on the Closing Date and thereafter on each three month anniversary thereof until termination of the Facility |
| Default Rate: | After default, the applicable interest rate will be increased by 5% per annum. |
| Rate and Fee Basis: | All per annum rates shall be calculated on the basis of a year of 360 days for actual days elapsed. |
| Maturity: | The Term Loan will mature 9 (9) months after the involuntary bankruptcy case is converted to a voluntary chapter 11 proceeding, or July 2, 2016 (the "Maturity Date"). |

## REVOLVING LOAN AGREEMENT

THIS LOAN AGREEMENT (this "Agreement") is made and entered into as of the _____ day of October 2015, by and among American Natural Energy Corporation ("Borrower"), an Oklahoma corporation with a principal address of 2512 East 71st St, Suite J, Tulsa, Oklahoma, Zip Code 74136 and Hillair Capital Investments L.P. ("Lender"), a Cayman Islands exempted limited partnership with a principal address c/o Hillair Capital Management LLC ,345 Lorton Avenue, Suite 303, Burlingame, CA 94010.

### WITNESSETH:

WHEREAS, Borrower has applied for a revolving credit facility from the Lender in the aggregate principal amount of up to $1,000,000.00; and

WHEREAS, the Lender is willing to make said revolving credit facility available to Borrower upon, and subject to, the terms, provisions and conditions hereinafter set forth and upon approval of the U.S. Bankruptcy Court for the Eastern District of Louisiana;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower and the Lender hereby mutually covenant and agree as follows:

### SECTION 1. DEFINITIONS

1.01 Definitions. In addition to the terms defined elsewhere in this Agreement or in any Exhibit or Schedule hereto, when used in this Agreement, the following terms shall have the following meanings (such meanings shall be equally applicable to the singular and plural forms of the terms used, as the context requires):

**Borrower's Obligations** shall mean any and all present and future indebtedness (principal, interest, fees, collection costs and expenses, attorney's fees and other amounts), liabilities and obligations (including, without limitation, indemnity obligations) of Borrower to the Lender evidenced by or arising under or in respect of this Agreement.

**Default** shall mean any event or condition the occurrence of which would, with the lapse of time or the giving of notice or both, become an Event of Default.

**Domestic Business Day** shall mean any day except a Saturday, Sunday or legal holiday.

**Event of Default** shall have the meaning ascribed thereto in Section 5.

**Fees** shall mean the closing fee of $50,000 and the annual collateral monitoring fee of $10,000 payable to Hillair Capital Management LLC on the Closing Date.

**GAAP** shall mean, at any time, generally accepted accounting principles at such time in the United States.

**Loan** and **Loans** shall have the meanings ascribed thereto in Section 2.01(a).

**Material Adverse Effect** shall mean:

(a) a material adverse effect on the properties, assets, liabilities, business, operations, prospects, income or condition (financial or otherwise) of Borrower and its Subsidiaries taken as a whole;

(b) material impairment of Borrower's ability to perform any of its obligations under this Agreement, the Note or any of the other Transaction Documents; or

(c) material impairment of the enforceability of the rights of, or benefits available to, the Lender under this Agreement, the Note or any of the other Transaction Documents.

**Notice of Borrowing** shall have the meaning ascribed thereto in Section 2.02.

**Person** shall mean any individual, sole proprietorship, partnership, joint venture, limited liability company, trust, unincorporated organization, association, corporation, institution, entity or government (whether national, Federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

**Rate** shall mean the interest rate for the Revolving Credit Facility, or specifically, a fixed rate of 12% per annum prior to default. After default, with a failure to timely cure same, "Rate" shall mean the default rate of 17% per annum.

**Revolving Credit Commitment** shall mean a maximum amount of $1,000,000.00.

**Revolving Credit Period** shall mean the period commencing on the date of this Agreement and ending on the date of Confirmation of a Chapter 11 Plan or Dismissal or Conversion of Borrower's Chapter 11. Unless agreed upon in writing by the Lender, the maximum term shall be nine months from the entry of the Order for Relief, or July 2, 2016.

**Transaction Documents** shall mean this Agreement and any and all other agreements, documents and instruments heretofore, now or hereafter delivered to the Lender with respect to or in connection with or pursuant to this Agreement, any Loans made hereunder or any of the other Borrower's Obligations, and executed by or on behalf of Borrower, all as the same may from time to time be amended, modified, extended, renewed or restated.

### SECTION 2. THE LOANS

2.01 Revolving Credit Commitment.

(a) Subject to the terms and conditions set forth in this Agreement and so long as no Default or Event of Default has occurred and is continuing, during the Revolving Credit Period, the Lender agrees to make such loans to Borrower (individually, a "Loan" and collectively, the "Loans") as Borrower may from time to time request pursuant to Section 2.02. The aggregate principal amount of Loans which the

Lender shall be required to have outstanding under this Agreement as of any date shall not exceed the Revolving Credit Commitment. Within the foregoing limits, Borrower may borrow under this Section 2.01(a), prepay under Section 2.07 and re-borrow at any time during the Revolving Credit Period under this Section 2.01(a). All Loans not paid prior to the last day of the Revolving Credit Period, together with all accrued and unpaid interest thereon and all fees and other amounts owing by Borrower to the Lender with respect thereto, shall be due and payable on the last day of the Revolving Credit Period.

2.02 Method of Borrowing.

(a) Borrower shall give notice (a "Notice of Borrowing") to the Lender by 10 a.m. local time on the Domestic Business Day of each Loan to be made to Borrower, specifying (i) the date of such Loan, which shall be a Domestic Business Day; and (ii) the aggregate principal amount of such Loan.  At a very minimum, the Notice of Borrowing shall be acknowledged and endorsed in writing by the Court-approved CRO for the Borrower.

(b) A Notice of Borrowing shall not be revocable by Borrower.

(c) Not later than 5 p.m. local time on the date of each Loan, the Lender shall make available the amount of such Loan to Borrower at the Lender's aforesaid address by crediting such funds to a demand deposit account of Borrower specified by Borrower (or such other account mutually agreed upon in writing between the Lender and Borrower).

(d) Borrower hereby irrevocably authorizes the Lender to rely on telephonic, telegraphic, telecopy, telex or written instructions of Borrower's Managers.

2.03 Interest Rates. So long as no Event of Default under this Agreement has occurred and is continuing, each Loan shall bear interest on the outstanding principal amount thereof, for each day from the date such Loan is made until it becomes due, at a rate per annum equal to twelve percent (12%).

2.04 Computation of Interest. Interest on Loans hereunder shall be computed on the basis of a year of 365 days and paid for the actual number of days elapsed (including the first day but excluding the last day).

2.05 Expenses. Borrower shall pay the reasonable expenses of the Lender, including, without limitation, the reasonable fees and disbursements of all legal, environmental or other consultants incurred in connection with the DIP loan.

2.06 Prepayments. Borrower may, upon notice to the Lender specifying that it is paying the Loans, pay without penalty or premium the Loans in whole at any time or in part from time to time, by paying the principal amount to be paid.

2.07 General Provisions as to Payments. Borrower shall make each payment of principal of, and interest on, the Loans and of fees and all other amounts payable by Borrower under this Agreement, not later than 5:00 p.m. local time on the date when due and payable, without condition or deduction for any counterclaim, defense, recoupment or setoff, in Federal or other funds immediately, to the Lender. All

payments received by the Lender after 5:00 p.m. local time shall be deemed to have been received by the Lender on the next succeeding Domestic Business Day. Whenever any payment of principal of, or interest on, the Loans or of fees shall be due on a day which is not a Domestic Business Day, the date for payment thereof shall be extended to the next succeeding Domestic Business Day. If the date for any payment of principal is extended by operation of law or otherwise, interest thereon, at the then applicable rate, shall be payable for such extended time.

## SECTION 3. PRECONDITIONS TO LOANS

3.01 Initial Loan. Notwithstanding any provision contained in this Agreement to the contrary, the Lender shall not have any obligation to make the initial Loan under this Agreement unless the Lender shall have first received:

(a) this Agreement and a Security Agreement, each executed by a duly authorized officer of Borrower;

(b) an order of the U.S. Bankruptcy Court for the Eastern District of Louisiana authorizing the loan.

3.02 All Loans. Notwithstanding any provision contained in this Agreement to the contrary, the Lender shall not have any obligation to make any Loan under this Agreement unless:

(a) the Lender shall have received a Notice of Borrowing, acknowledged and endorsed in writing by the Court-approved CRO, for such Loan as required by Section 2.02;

(b) both immediately before and immediately after giving effect to such Loan, no Default or Event of Default under this Agreement shall have occurred and be continuing;

(c) (intentionally left blank); and

(d) all of the representations and warranties made by Borrower in this Agreement and/or in any of the other Transaction Documents shall be true and correct in all material respects on and as of the date of such Loan as if made on and as of the date of such Loan.

Each request for a Loan by Borrower under this Agreement shall be deemed to be a representation and warranty by Borrower on the date of such Loan as to the facts specified in clauses (b), (c) and (d) of this Section 3.02.

## SECTION 4. REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to the Lender that:

4.01 Corporate Existence and Power. Borrower: (a) is duly incorporated, validly existing and in good standing under the laws of the State of Louisiana; (b) has all requisite corporate powers required to carry on its business as now conducted; (c) has all requisite governmental and regulatory licenses, authorizations, consents and approvals required to carry on its business as now conducted, except such licenses, authorizations, consents and approvals the failure to have could not reasonably be expected to

have a Material Adverse Effect; and (d) is qualified to transact business as a foreign corporation in, and is in good standing under the laws of, all states in which it is required by applicable law to maintain such qualification and good standing except for those states in which the failure to qualify or maintain good standing could not reasonably be expected to have a Material Adverse Effect.

4.02 Corporate Authorization. The execution, delivery and performance by Borrower of this Agreement and the other Transaction Documents are within the corporate powers of Borrower and have been duly authorized by all necessary corporate and other action on the part of Borrower.

4.03 Binding Effect. This Agreement, the Note and the other Transaction Documents have been duly executed and delivered by Borrower and constitute the legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency or other similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

## SECTION 5. EVENTS OF DEFAULT

If any of the following (each of the following herein sometimes called an "Event of Default") shall occur and be continuing:

5.01 Borrower shall fail to pay any of the Borrower's Obligations constituting principal due under the Loans as and when the same shall become due and payable;

5.02 Borrower shall fail to pay any of the Borrower's Obligations constituting expenses or other amounts (other than principal due under the Loans);

5.03 Any representation or warranty made by Borrower in this Agreement, in any other Transaction Document or in any certificate, agreement, instrument or written statement furnished or made or delivered pursuant hereto or thereto or in connection herewith or therewith, shall prove to have been untrue or incorrect in any material respect when made or effected;

5.04 Borrower shall fail to perform or observe any term, covenant or provision contained in this agreement;

5.05 There occurs any uninsured damage to or loss, theft, or destruction of any collateral given for the loan ;

5.06 This Agreement or any of the other Transaction Documents shall at any time for any reason (other than termination of this Agreement or such other Transaction Documents, as the case may be, in accordance with its terms) cease to be in full force and effect or shall be declared to be null and void by a court of competent jurisdiction, or if the validity or enforceability thereof shall be contested or denied by Borrower, or if the transactions completed hereunder or thereunder shall be contested by Borrower or if Borrower shall deny that it has any further liability or obligation hereunder or thereunder;

5.07 Any of the following:

(a) Debtor breaches or violates any term of the Interim Order, the Final Order, or any Order of the U.S. Bankruptcy Court for the Eastern District of Louisiana;

(b) Debtor uses Operations Advances for purposes not authorized by the Bankruptcy Code or the U.S. Bankruptcy Court for the Eastern District of Louisiana;

(c) (intentionally left blank);

(d) the creation, existence or allowance of any non-ordinary course Indebtedness, whether recourse or nonrecourse, and whether superior or junior, resulting from borrowings, loans, advances, or the granting of credit, whether secured or unsecured, except

     (i) Indebtedness to Lender arising under or as a consequence of the DIP Loan Agreement or the other Loan Documents and

     (ii) Indebtedness existing on the Petition Date or otherwise expressly permitted under the DIP Loan Agreement or the orders of the U.S. Bankruptcy Court for the Eastern District of Louisiana;

(e) the creation, existence or allowance of any Liens on any of Debtor's properties or assets except the Liens existing as of the Petition Date and the Liens created or permitted under the DIP Loan Agreement or the orders of the U.S. Bankruptcy Court for the Eastern District of Louisiana; or

(f) The occurrence of any of the following in the Case:

     (i) the bringing of a motion, taking of any action or the filing of any plan or reorganization or disclosure statement attendant thereto by Debtor; to sell any assets of Debtor through a sale under Section 363 of the Bankruptcy Code; to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to the DIP Loan Agreement; to grant any Lien upon or affecting any Collateral; or any other action adverse to Lender or its rights and remedies hereunder or its interest in the Collateral;

     (ii) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Interim Order or the Final Order without the written consent of Lender, or the filing of a motion for reconsideration with respect to the Interim Order or the Final Order;

     (iii) the Final Order is not entered immediately following the expiration of the Interim Order;

     (iv) the payment of, or application for authority to pay, any prepetition claim without Lender's prior written consent or pursuant to an order of the Bankruptcy Court after notice and hearing unless otherwise permitted under the DIP Loan Agreement;

     (v) (intentionally left blank);

(vi)  the appointment of an interim or permanent trustee in the Case or the appointment of an examiner in the Case; or the sale without Lender's consent, of all of Debtor's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Case, or otherwise that does not provide for payment in full of the Obligations and termination of Lender's commitment to make the Advances;

(vii)  the dismissal of the Case, or the conversion of the case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or the filing of a motion or other pleading by Debtor seeking the dismissal of the Case under Section 1112 of the Bankruptcy Code or otherwise;

(viii)  the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor to execute upon or enforce a Lien on any Collateral;

(ix)  the commencement of a suit or action against Lender and, as to any suit or action brought by any Person other than Debtor or a subsidiary, officer or employee of Debtor, the continuation thereof without dismissal for 30 days after service thereof on Lender, that asserts by or on behalf of Debtor, the Environmental Protection Agency, any state environmental protection or health and safety agency, or any official committee in the Case, any claim or legal or equitable remedy which seeks subordination of the claim or Lien of Lender.  Notwithstanding the foregoing, the filing of an adversary proceeding to determine the rank, validity and priority of pre-petition liens against bankruptcy estate property, including the pre-petition claim and mortgage held by Lender, shall not be an event of default; or

(x)  the entry of an order in the Case granting any other super-priority claim or Lien equal or superior to the claims and Liens granted to Lender;

THEN, and in each such event the Lender may declare that the obligations of the Lender to make Loans under this Agreement have terminated, whereupon such obligations of the Lender shall be immediately and forthwith terminated, and the Lender may further declare the entire outstanding principal balance of and all accrued and unpaid interest on the Note and all of the other Borrower's Obligations to be forthwith due and payable, whereupon all of the unpaid principal balance of and all accrued and unpaid interest on the Note and all of such other Borrower's Obligations shall become and be immediately due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by Borrower, and the Lender may exercise any and all other rights and remedies which they may have under any of the other Transaction Documents or under applicable law; provided, however, that upon the occurrence of any event described in Section 5, the obligation of the Lender to make Loans under this Agreement shall automatically terminate and the entire outstanding principal balance of and all accrued and unpaid interest on the Note and all of the other Borrower's Obligations shall automatically become immediately due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by Borrower, and the Lender may exercise any and all other rights and remedies which they may have under any of the other Transaction Documents or under applicable law.

## SECTION 6. GENERAL

6.01 No Waiver. No failure or delay by the Lender in exercising any right, remedy, power or privilege

under this Agreement or under any other Transaction Document shall operate as a waiver thereof; nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights and remedies provided in this Agreement and in the other Transaction Documents are cumulative and not exclusive of any remedies provided by law. Nothing herein contained shall in any way affect the right of the Lender to exercise any statutory or common law right of banker's lien or set-off.

6.02 Right of Set-Off. Upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, without notice to Borrower (any such notice being expressly waived by Borrower) and to the fullest extent permitted by law, to set-off and apply any and all deposits (general or special, time or demand, provisional or final, but specifically excluding any trust or segregated accounts) at any time held by the Lender and any and all other indebtedness at any time owing by the Lender to or for the credit or account of Borrower against any and all of the Borrower's Obligations irrespective of whether or not the Lender shall have made any demand under this Agreement or under any of the other Transaction Documents and although such obligations may be contingent or unmatured. The Lender agrees to promptly notify Borrower after any such set-off and application made by the Lender, provided, however, that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Lender under this Section 6 are in addition to any other rights and remedies (including, without limitation, other rights of set-off) which the Lender may have. Nothing contained in this Agreement or any other Transaction Document shall impair the right of the Lender to exercise any right of set-off or counterclaim it may have against Borrower and to apply the amount subject to such exercise to the payment of indebtedness of Borrower unrelated to this Agreement or the other Transaction Documents.

6.03 Cost and Expenses. Borrower agrees, whether or not any Loan is made under this Agreement, to pay or reimburse the Lender upon demand for (a) all out-of-pocket costs and expenses (including, without limitation, reasonable attorney's fees and expenses incurred by the Lender in connection with the preparation, documentation, negotiation and/or execution of this Agreement and/or any of the other Transaction Documents; (b) all recording, filing and search fees and expenses incurred by the Lender in connection with this Agreement and/or any of the other Transaction Documents; (c) all out-of-pocket costs and expenses (including, without limitation, reasonable attorney's fees and expenses) incurred by the Lender in connection with the (i) the preparation, documentation, negotiation and execution of any amendment, modification, extension, renewal or restatement of this Agreement and/or any of the other Transaction Documents; or (ii) the preparation of any waiver or consent under this Agreement or under any of the other Transaction Documents; and (d) if an Event of Default occurs, all out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by the Lender in connection with such Event of Default and collection and other enforcement proceedings resulting therefrom. Borrower further agrees to pay or reimburse the Lender upon demand for any stamp or other similar taxes which may be payable with respect to the execution, delivery, recording and/or filing of this Agreement and/or any of the other Transaction Documents.

6.04 General Indemnity. In addition to the payment of expenses pursuant to Section 6, whether or not the transactions contemplated hereby shall be consummated, Borrower hereby agrees to defend, indemnify, pay and hold the Lender and any holders of the Note, and the officers, directors, employees, agents and affiliates of the Lender and such holder (collectively, the "Indemnitees") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits,

claims, disbursements, costs and expenses of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for such Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnitees shall be designated a party thereto), that may be imposed on, incurred by or asserted against the Indemnitees, in any manner relating to or arising out of this Agreement, any of the other Transaction Documents or any other agreement, document or instrument executed and delivered by Borrower in connection herewith or therewith, the statements contained in any commitment letters delivered by the Lender, the agreement of the Lender to make the Loans under this Agreement or the use or intended use of the proceeds of any Loan under this Agreement (collectively, the "indemnified liabilities"); provided that:

(a) Borrower shall have no obligation to an Indemnitee hereunder with respect to indemnified liabilities directly and solely resulting from the gross negligence or willful misconduct of that Indemnitee as determined by a court of competent jurisdiction in a final, non-appealable order; and

(b) Borrower shall have no obligation to indemnify the Lender with respect to disputes between the Lender or with respect to disputes among the Lender. To the extent that the undertaking to indemnify, pay and hold harmless set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all indemnified liabilities incurred by the Indemnitees or any of them. The provisions of the undertakings and indemnification set out in this Section 6 shall survive satisfaction and payment of the Borrower's Obligations and the termination of this Agreement.

6.05 Notices. Each notice, request, demand, consent, confirmation or other communication under this Agreement shall be in writing and delivered in person or sent by facsimile or registered or certified mail, return receipt requested and postage prepaid, to the applicable party at its address or facsimile number set forth on the signature pages hereof, or at such other address or facsimile number as any party hereto may designate as its address for communications hereunder by notice so given. Such notices shall be deemed effective on the day on which delivered or sent if delivered in person or sent by facsimile (with answerback confirmation received), or on the third (3rd) Domestic Business Day after the day on which mailed, if sent by registered or certified mail.

6.06 Governing Law. This Agreement shall be governed by and construed in accordance with the substantive laws of the State of Louisiana (without reference to conflict of law principles).

6.07 Amendments and Waivers. Any provision of this Agreement, the Note or any of the other Transaction Documents to which Borrower is a party may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by both parties hereto; provided however, that notwithstanding the foregoing (a) no such amendment shall increase the Revolving Credit Commitment unless such amendment is signed by the Lender; and (b) no such amendment or waiver shall, unless signed by the Lender:

    (i) decrease the Revolving Credit Commitment;

    (ii) extend the term of the Revolving Credit Period;

(iii) reduce the principal amount of or rate of interest on any Loan or any fees hereunder;

(iv) postpone the date fixed for any payment of principal of or interest on any Loan or any fees hereunder; or

(v) waive any Event of Default caused by the failure of Borrower to pay any principal of and/or interest on any Loan or any fees hereunder when due.

6.08 References; Headings for Convenience. Unless otherwise specified herein, all references herein to Section numbers refer to Section numbers of this Agreement. The Section headings are furnished for the convenience of the parties and are not to be considered in the construction or interpretation of this Agreement.

6.09 Severability. In the event any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

6.10 Counterparts. This Agreement may be executed in any number of counterparts (including facsimile counterparts), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Borrower and the Lender have executed this Loan Agreement as of the _____ day of October , 2015.

BORROWER:                                              LENDER:

_____          _____
Signature of Authorized Borrower for American      Signature of Authorized Lender for Hillair
Natural Energy Corporation                         Capital Investments L.P.

_____          _____
Print Name                                         Print Name

_____          _____
Date                                               Date